[Crim. No. 10957. In Bank. Dec. 12, 1967.]

THE PEOPLE, Plaintiff and Respondent, v. DANIEL WILLIAM ALESI, Defendant and Appellant.

Daniel William Alesi, in pro. per., Earl Klein, under appointment by the Supreme Court, and James R. Montgomery, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Philip C. Griffin, Deputy Attorney General, for Plaintiff and Respondent.

MOSK, J.—Defendant appeals from a judgment of conviction entered upon a jury verdict finding him guilty of two counts of selling heroin (Health & Saf. Code, § 11501), and one count of possession of marijuana (Health & Saf. Code, § 11530), and also finding to be true an allegation charging a prior felony narcotic conviction (Health & Saf. Code, § 11500). He was sentenced to imprisonment in the state prison with the sentences to run concurrently on all counts.

On June 12, 1962, White, a narcotics undercover agent, gave $40 to Robert Baldry, an informer, and Baldry handed the money to defendant, who was accompanied by Patricia Hardy, originally a codefendant in this action.[1] While Baldry and Miss Hardy circled the block in the latter's vehicle, defendant Alesi entered a restaurant, and when he rejoined the others he was carrying three balloons in his mouth. They

---

[1] Miss Hardy pleaded guilty.

returned to Baldry's apartment, and as they parked Alesi handed two of the balloons to Baldry. After the three reentered the apartment, where White had remained, Baldry handed White the two balloons which were subsequently proved to contain heroin. Miss Hardy retained the balance of the heroin, and she later gave the last balloon to White.

On June 15, 1962, three days later, a second transaction was consummated by prearrangement. On this occasion White handed Miss Hardy $75, and she departed in her car to obtain the heroin. Shortly thereafter Miss Hardy returned, informed the deputy that she would retain a gram of heroin for her services and then gave the balance of the narcotics to Alesi, who attempted to tie a knot in the balloon in which it was contained. White took the heroin from Alesi.

On the basis of White's investigation and the foregoing events, a warrant was issued for the arrest of defendant Alesi. Three deputies, Meyers, Lesnick, and White, effectuated the arrest in the early morning at the apartment of Janice Kline, another acquaintance of defendant. Meyers made a quick search, which uncovered in Alesi's shirt pocket a "cocktail," a tobacco cigarette embellished at the tip with an inserted hand-rolled cigarette found to contain marijuana. The officer immediately asked Alesi if the "cocktail" was his and he admitted it was, and, in response to a second question, admitted it contained marijuana.

As the deputies and defendant proceeded to the police station following the arrest, Meyers asked him if he knew White, and he indicated that he recognized him but insisted that he was not guilty of the sales. There was no further police interrogation.

Defendant was duly arraigned and pleaded not guilty. During the course of the trial, counsel stipulated to a mistrial, which the court ordered. The People moved to strike the allegation of defendant's prior felony narcotics conviction, and this was granted. He then pleaded guilty and petitioned under Penal Code, section 6451 (now Welf. & Inst. Code, § 3051) for commitment as an addict, and this was granted.

In subsequent interviews with John Linker, his probation officer, defendant admitted he was using heroin on a regular basis, that the marijuana cigarette belonged to him; however, he did not admit the heroin sales with which he was charged. These admissions were made both orally and in a written statement submitted by him to the probation officer.

Defendant was sent to the California Rehabilitation Center, but was thereafter returned to court as being an unfit subject for treatment in that institution (Pen. Code, § 6453, now Welf. & Inst. Code, § 3053). He thereupon moved to withdraw his plea of guilty, and this motion was granted. At the same time, the allegation of the prior narcotics conviction was reinstated. At this point, defendant's first counsel, Richard Walton, was permitted to withdraw, and new counsel was appointed by the court. Upon retrial, defendant was found guilty as indicated above.

Defendant contends that three sets of statements introduced in evidence against him contravene *Escobedo* v. *Illinois* (1964) 378 U.S. 478 [12 L.Ed.2d 977, 84 S.Ct. 1758], and *People* v. *Dorado* (1965) 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361]. Even though the trial in this case occurred before *Escobedo* was announced, it is now settled that the defendant may take advantage of *Escobedo* and *Dorado* since his case arises on appeal after those decisions. (*People* v. *Rollins* (1967) 65 Cal.2d 681 [56 Cal.Rptr. 293, 423 P.2d 221]; *In re Lopez* (1965) 62 Cal.2d 368 [42 Cal.Rptr. 188, 398 P.2d 380].) In *Rollins* we reaffirmed *Lopez* because "we need not invite the anomalies and the manifest injustice which the rejection of *Lopez,* at the virtual end of its natural life, would entail." (*People* v. *Rollins, supra,* at p. 691 of 65 Cal.2d.) Therefore, we consider on the merits the *Escobedo* and *Dorado* contentions advanced by defendant.

After the first trial, defendant pleaded guilty on the advice of his attorney so that prompt commitment to the California Rehabilitation Center could be arranged. At an oral interview following his plea, he told his probation officer that he was using heroin and that the marijuana cigarette discovered by the arresting officers was his. Defendant also submitted a statement in his own handwriting in which he confessed to marijuana possession and also admitted heroin use, although he did not admit the sales charged in the indictment. At the second trial, he denied the marijuana possession, and his written statement was introduced for impeachment purposes. On cross-examination he testified that his admissions to the probation officer were made on the advice of his then attorney.

On this record it is clear that defendant's statements to his probation officer are not embraced within the rule enunciated in *People* v. *Quinn* (1964) 61 Cal.2d 551 [39 Cal.Rtpr. 393, 393 P.2d 705]. In *Quinn* the probation officer admonished convicted defendants that unless they were telling the truth

he would not recommend probation. Since any subsequent admissions or confessions thus were induced by the promise of leniency, we held they were involuntary and therefore inadmissible in a later trial. This defendant's predicament is markedly different. His statements to the probation officer were made upon the advice of counsel. In acting with the benefit of legal advice, he cannot now complain that the information volunteered was elicited in violation of his rights under *Escobedo* and *Dorado*. (*People* v. *Brooks* (1965) 234 Cal.App.2d 662, 671-672 [44 Cal.Rptr. 661] ; *People* v. *Garcia* (1966) 240 Cal.App.2d 9, 12-13 [49 Cal.Rptr. 146, 15 A.L.R.3d 1352].) ■ Thus, in a later trial the People may introduce admissions made to a probation officer, either directly or for impeachment purposes, where it affirmatively appears in the record that the defendant made those admissions under the guiding hand of counsel, unless the defendant can establish that his attorney, in concert with the court or the People, misrepresented his eligibility for or likelihood of admission to the state narcotics treatment facility. (See *In re Nunez* (1965) 62 Cal.2d 234, 236 [42 Cal.Rptr. 6, 397 P.2d 998].)

■ Here, it appears that defendant's first attorney believed he could best discharge his duty to his client, who was then on parole from a prior narcotics conviction, by securing, if possible, his admission to the California Rehabilitation Center. There is nothing in the record to question the soundness of this advice. Thereafter, the attorney and the People, with the help of the court, fulfilled their promises to employ their best efforts to have defendant placed in the center. Indeed, he was sent there. It was at the center that he was found to be an unfit subject for treatment.

It is not unrealistic to anticipate that a defendant rejected by the narcotics rehabilitation center, a possibility which can be foreseen, will be faced at a subsequent trial with statements made to a probation officer under the advice of counsel. An apprehensive counsel, of course, can caution the defendant that anything he says to his probation officer might be used in a subsequent trial. The critical element is that the defendant is represented by counsel, and counsel has the opportunity to fully inform him of the risks he takes by full or false disclosures to his probation officer.

Although under these circumstances we find no reason to hold defendant's statements to his probation officer inadmissible, it is not difficult to contemplate circumstances in which the use of such testimony would be tainted. ■ Thus, unless it

clearly appeared from the record that a defendant, like Alesi, was acting under the advice of counsel or that he waived his right to counsel and was advised of his right to remain silent (see *People* v. *Stewart* (1965) 62 Cal.2d 571 [43 Cal.Rptr. 201, 400 P.2d 97], affd. sub nom. *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 695, 86 S.Ct. 1602, 10 A.L.R.3d 974]), the People could not use the statements, even for impeachment purposes, because, as the court recognized in *People* v. *Garcia* (1966) 240 Cal.App.2d 9, 13 [49 Cal.Rptr. 146, 15 A.L.R.3d 1352] : "in order [for the probation officer] to get full cooperation from a defendant he should be advised that any statement he makes will be used only for the information of the court in a probationary hearing. We do not doubt that defendants have that belief and that if they knew their damaging admissions could be used against them in another trial they would not talk freely and the purpose of the interview would be frustrated."

Defendant next contends that his admissions to the police officers after his arrest constitute *Escobedo* and *Dorado* violations. After the arrest of Alesi at Miss Kline's apartment, he was taken by police car to the police station. Officer Meyers testified that the following dialogue took place in the vehicle : "We asked him if he knew who Deputy White was, who was seated in the car next to him, I believe, and he says, 'Well, I guess he's the man.' Something similar to that. And I asked him about the occasions when he sold heroin to Deputy White and he said that he didn't feel that he was guilty of the sale, that he thought the girl had done it but he was along. And we didn't discuss the marijuana again."

Since this questioning was undertaken after defendant had been arrested for the heroin offenses, it is clear that the police were under an obligation to advise him of *Escobedo* and *Dorado* rights. Their failure to give the warnings constitutes error of federal constitutional dimension, and we must thus determine if the error resulted in prejudice. (*Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824].)

Because defendant's admissions were entirely consistent with his defense at trial, it is arguable that their introduction into evidence induced him to take the stand and confined his defense to a presentation consistent with those admissions. As we explained in *People* v. *Spencer* (1967) 66 Cal.2d 158, 168 [57 Cal.Rptr. 163, 424 P.2d 715], "To overcome the likelihood that the erroneous introduction of defendant's

extrajudicial confession impelled his testimonial one, the State bears the burden of showing that the causative link between the two confessions had been broken. '[T]he beneficiary of a constitutional error [must] prove *beyond a reasonable doubt* that the error complained of did not contribute to the verdict obtained.' (Italics added.) (*Chapman* v. *California, supra* [at p. 24 [17 L.Ed.2d at p. 710]].)'"

At trial, both Officer White and Miss Hardy testified for the People that defendant had been present at the time the heroin sales were consummated. The People's case rested on the fact that their testimony implicated defendant in the sales. To assert a meaningful defense, it became incumbent upon defendant to rebut that testimony. While he could have denied his presence when the sales were transacted, he would have thereby placed his own credibility in serious jeopardy; the People's eyewitness testimony would not, realistically, permit him to make such a defense. In essence, the trial was a contest in credibility between defendant and Baldry for the defense and Officer White and Miss Hardy for the prosecution. Defendant's own witness, Baldry, confirmed defendant's presence during the sales; the thrust of his testimony, like that of defendant, was that Miss Hardy alone bore full responsibility for the sales. There was no other meaningful defense available to defendant, and his admissions to the officers in the police car were consistent with this position.

Upon a thorough review of the record, we can unequivocally state our "belief that [the error] was harmless beyond a reasonable doubt." (*Chapman* v. *California, supra,* at p. 24 [17 L.Ed.2d at p. 711].)

Finally, defendant argues that his admissions at the time of his arrest, in which, according to Officer Meyers, he acknowledged possession of a marijuana cigarette, were violative of his *Escobedo* and *Dorado* rights. It is conceded that he was not apprised of these rights. In determining admissibility we relate the circumstances surrounding utterance of the admissions.

At trial, Officer Meyers testified that he apprehended defendant in the bedroom of Miss Kline's apartment. When he entered the bedroom, defendant was seated on the bed, with a hammer at his side. Officer Lesnick, who had accompanied Meyers into the bedroom, informed defendant he was under arrest, ordered him to raise his hands, and when he failed to respond, Lesnick and Meyers pushed him away from the hammer, handcuffed him, and Lesnick, in conducting a

quick search of the defendant, removed a marijuana cigarette from defendant's shirt pocket. Meyers testified: "I asked the defendant if this was his and he said, 'Yes.' I asked him if he knew what it was and he said, 'Yes.' And I said, 'It's weed, isn't it?' He said, 'Yes.'" Meyers then testified that in narcotic jargon "weed" is a common synonym for marijuana.

Defendant disputed the officer's reconstruction of events at the time of his arrest. He testified that the arresting officers hit him on the head with a hard object, possibly a gun, that when he recovered consciousness, he was handcuffed, that he was not searched, and that when confronted by the cigarette he denied that it was his, stating that he had never seen it before. According to defendant, the officers were prepared to arrest Miss Kline for possession of marijuana, that she began to cry, and that he then acknowledged possession of the cigarette to protect Miss Kline. "If they are going to take a girl down to jail just over a cigarette," defendant testified, "you know, I mean I don't like to see girls cry."

Miss Kline, who testified for the People, stated that Officer White told her that she too was going to jail but that defendant told the officers to leave her alone. She recalled that an officer had extracted a cigarette from defendant's pocket; she was unable to recall the conversation between defendant and the officers concerning possession of the marijuana cigarette. The officers did not arrest Miss Kline.

 Viewing the evidence most favorably to the prosecution, as we must on appeal from a judgment of conviction, we accept Meyers' testimony that pursuant to the search defendant immediately admitted possession of the marijuana cigarette. The admission of marijuana possession, though elicited, did not result from an extended police interrogation. It concerned a crime (marijuana possession) that was unrelated to the charges (heroin sales) for which the arrest warrant had been issued. The shakedown search of defendant, in view of the accessibility of a weapon, was reasonable, and the subsequent question by the officer offered defendant an opportunity to explain away a crime that appeared to be committed in his presence. The queries were a natural product of the fast-moving events and gave the deputies an opportunity to exonerate an innocent person, Miss Kline, who was also in the apartment at the time and could have been involved in ownership of the contraband. The questions concluded the inquiry into the newly discovered crime, marijuana possession, and we

hold that under the circumstances this was a routine investigation and not violative of *Escobedo-Dorado*.

*People* v. *Garavito* (1967) 65 Cal.2d 761 [56 Cal.Rptr. 289, 423 P.2d 217], also involving a brief police interrogation without relevant admonitions, is factually distinguishable. In that case the interrogation involved the very object, heroin, the possession of which caused the arrest. By contrast, here the officers discovered a new crime unrelated to the charges for which the defendant had been arrested, and they were obligated to make an on-the-scene investigation to ascertain the responsibility of those present. The instant case is factually analogous to *People* v. *Brooks* (1965) 234 Cal.App.2d 662, 668-671 [44 Cal.Rptr. 661], in which the defendant was validly arrested as a robbery suspect and searched. The search revealed four marijuana cigarettes on his person, and the arresting officer asked him if they were marijuana to which he replied in the affirmative. Although the defendant was thereafter exonerated of the robbery, the court held the statement admissible on a charge of marijuana possession.

As we said in *People* v. *Cotter* (1965) 63 Cal.2d 386, 393 [46 Cal.Rptr. 622, 405 P.2d 862], "Clearly, the statement made in the police car was not the product of a process of interrogation aimed at eliciting incriminating statements from defendant. The police merely asked him what happened . . . [at the scene of the crime]. They were affording him an opportunity which police officers normally and routinely offer to any person whom they are taking into custody to give any explanation of his conduct which he may desire to give. It is a routine means of commencing an investigation."

The judgment is affirmed.

Traynor, C. J., McComb, J., Peters, J., Tobriner, J., Burke, J., and Sullivan, J., concurred.

Appellant's petition for a rehearing was denied January 11, 1968.