[Crim. No. 15214. In Bank. May 5, 1971.]

THE PEOPLE, Plaintiff and Respondent, v.
ALFONSO HICKS, Defendant and Appellant.

758

## COUNSEL

Donald F. Roeschke, under appointment by the Supreme Court, and Kathleen J. Kirkland, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch and Evelle J. Younger, Attorneys General, William E. James, Assistant Attorney General, and Lawrence P. Scherb II for Plaintiff and Respondent.

## OPINION

MOSK, J.—Defendant appeals from a judgment convicting him of robbery in the first degree. He contends that the trial court committed prejudicial error in ruling admissible a written statement he made to another judge in the post-conviction proceedings of an earlier, related case; that the photographic identification procedure here used was unduly suggestive; and that the finding he was armed at the time of the offense was improper and should be stricken from the judgment. We conclude that only the last of these contentions warrants relief.

The victim, Michael Fisher, was a taxicab driver. At 4 a.m. on July 14, 1968, he was parked in a lighted area outside the Carolina Pines Restaurant in Los Angeles. Defendant and one Heedley came out of the restaurant and directed Fisher to drive them to Highland Park. During the drive he turned and conversed with them while stopped at an intersection, and was able to observe them at close range.

When they reached their destination, Fisher asked for his fare. Instead, Heedley put a gun against his ribs and said, "This is a holdup." Defendant then reached over the front seat, took the keys from the ignition switch, and ransacked Fisher's coat which was lying on the seat. Heedley forced Fisher to get out of the cab and hand over his cash. Defendant came up to Fisher and demanded, in addition, his small change and his class ring. By this time it was daylight, and Fisher could clearly see his assailants as they stood facing him. Finally they ordered him to start running, and as he did so he heard a shot fired.

Defendant and Heedley were arrested two days later at the Carolina Pines Restaurant. At the time of his arrest defendant was found to be carrying a loaded gun in his coat pocket. For this offense he was convicted in October 1968 of violating Penal Code section 12025 (carrying a concealed weapon), a felony. A probation report was ordered. Included in the report thereafter filed was a letter written by defendant on October 21, 1968, to the judge who tried the case. In that letter defendant claimed he had obtained the gun in trade only two hours before his arrest and intended to turn it in to the police.[1]

The present prosecution for robbery was instituted in January 1969. After the jury was sworn defendant moved for a preliminary ruling on the admissibility of his letter of October 21. The prosecutor candidly explained, "If the defendant chooses to testify I am going to cross-examine him. I don't know what statements he's made. I would introduce, if the defendant elects to testify that he did not have the gun the night before—there's a case in which he was convicted of possession of the gun and in which he wrote a letter to the judge, saying, 'I obtained the gun on that night,' and I would plan to impeach him by that statement made by him at the time he was represented by a counsel in a letter written to the judge, which is in the court file." Accordingly, defendant requested an order prohibiting the prosecutor from introducing the October 21 letter at the trial for any purpose whatever.

In the absence of the jury, defendant testified to the circumstances surrounding the writing of the letter. He stated that the probation officer "told me to write a letter to the judge and relate the circumstances of how I was arrested and how I came about the gun and how I felt about the arrest and my status at home." When defendant asked "what good" such a letter would do, the probation officer replied that "he didn't know; that it might help." The probation officer did not inform defendant that he had a right to remain silent or to have counsel present, or that any statement he might make could be used against him in a subsequent proceeding; and defendant did not have the latter possibility in mind when he wrote his letter to the judge. Although defendant had an attorney of record at the time, that attorney had advised him only that "someone from the probation office would come out and talk with me."

On the authority of *People* v. *Alesi* (1967) 67 Cal.2d 856 [64 Cal.Rptr.

---

[1]The letter read in relevant part: "My intentions were to turn the gun in, thinking I would receive $10. I know you'll find this hard to believe, but I misunderstood a news broadcast. This all took place in the later part of June after Senator Kennedy's death. I had the gun for about two hours before my arrest outside of Carolina Pines Jr.; before I could carry out my intentions I was arrest[ed]. I got the gun down on the strip in exchange for a wron [*sic*] out too small leather coat."

104, 434 P.2d 360], the court denied the motion. In *Alesi* we held admissible at a later trial certain incriminating statements made by the defendant to the probation officer after his attorney had expressly advised him to do so. The parties now dispute the relevance of *Alesi* to the case at bar: the Attorney General contends that the mere fact of representation by counsel is enough to invoke the *Alesi* rule, while defendant takes the position that *Alesi* will not operate unless such counsel affirmatively advises his client to make a statement to the probation officer.

Since our decision in *Alesi,* however, the emphasis in this area has shifted away from technical considerations of whether and in what respects the defendant was "represented" by counsel at the time of the probation interview.[2] Rather, our recent concern has been to achieve a more realistic appraisal of the true character and purpose of that interview, and to maximize its beneficial role in the penal process. Thus while the present case was on appeal this court essentially limited the holding in *Alesi* to situations in which the defendant's statements were "volunteered" because made on the express advice of counsel. (*People* v. *Harrington* (1970) 2 Cal.3d 991, 999-1000 [88 Cal.Rptr. 161, 471 P.2d 961].) But in the case at bar defendant's counsel gave defendant no advice whatever in this regard; on the contrary, it was not counsel but the probation officer who directed defendant to write the October 21 letter to the judge and told him it might help.

In these premises defendant's statement was not "voluntary" in the strict constitutional sense. (*People* v. *Quinn* (1964) 61 Cal.2d 551, 554 [39 Cal.Rptr. 393, 393 P.2d 705], and cases cited.) The *Harrington* court enunciated the rule that "admissions made to a probation officer in the hope that candor will persuade the probation officer to make a favorable report to the court are not admissible either for substantive evidence or for impeachment in any retrial on the same issues." (2 Cal.3d at p. 999.) A fortiori, admissions made to a trial judge at the direction or suggestion of a probation officer in the hope that candor will persuade the judge to grant probation are inadmissible as substantive evidence or for impeachment in any later proceeding against him. In *Alesi* we expressly recognized the salutary policy implemented by these rules: quoting from *People* v. *Garcia* (1966) 240 Cal.App.2d 9, 13 [49 Cal.Rptr. 146, 15 A.L.R.3d 1352], we observed that "in order [for the probation officer] to get full cooperation from a defendant he should be advised that any statement he makes will be used only for the information of the court in

---

[2]Indeed, every defendant who has had counsel at trial will be "represented" in at least the minimal sense of having an attorney of record when he is interviewed by the probation officer. That interview takes place before sentencing, and trial counsel is ordinarily not relieved of his duties until judgment is pronounced.

a probationary hearing. We do not doubt that defendants have that belief and that if they knew their damaging admissions could be used against them in another trial they would not talk freely and the purpose of the interview would be frustrated." (67 Cal.2d at p. 862.) After *Harrington,* it is evident that the policy in favor of free and unfettered communication between a defendant and the probation authorities is paramount.

■ Assuming that defendant's letter was inadmissible in the circumstances of the present case, however, no prejudice flows from the court's ruling to the contrary. As matters turned out defendant did not choose to take the stand at trial, and the letter was therefore never read to the jury. His counsel on appeal argues it is "very likely" that defendant would have testified but for the adverse ruling on this point. No such likelihood appears from the record. The letter in question was written after defendant's conviction in October 1968 of the felony of carrying a concealed weapon. Inasmuch as the robbery prosecution was not a "retrial" of that charge, Penal Code section 1180 would not have barred reference to the prior conviction in the subsequent proceeding. Defense counsel must have known that whether or not his client's *statement* acknowledging possession of the weapon at the time of arrest was admissible for impeachment, his *conviction* of that same fact could in any event be used to impeach him if he took the stand. (Evid. Code, § 788.)

Thus in *People* v. *Tiner* (1970) 11 Cal.App.3d 428 [89 Cal.Rptr. 834], one of two charged prior convictions was not in fact a felony; the judge nevertheless indicated that both could be used to impeach the defendant if he testified, and he did not take the stand. Rejecting the defendant's argument that the error precluded him from testifying, the Court of Appeal reasoned (at p. 442): "The second prior could have been used to impeach defendant had he taken the stand and testified. It would be sheer speculation for us to conclude that defendant would have taken the stand and testified had he known that he could be impeached by the showing of only one prior felony conviction rather than two." By parity of analysis, it is sheer speculation to argue that defendant in the case at bar would have testified had he known he could be impeached only by the prior felony conviction rather than by the conviction and his subsequent letter to a judge on the same topic. We are convinced that any error in the ruling here challenged was harmless beyond a reasonable doubt. (*Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710, 87 S.Ct. 824, 24 A.L.R.3d 1065].)[3]

---

[3]Defendant's argument to the contrary is predicated on a series of unwarranted assumptions: it presumes that, as discussed above, he would have testified but for the ruling; that if he testified, he would have denied the particular facts recounted in the letter; and that his consequent impeachment would have contributed to the

■ Defendant next contends he was denied due process of law because the photographic identification procedure followed in this case was unduly suggestive. The record does not support this claim. Immediately after the robbery, Fisher gave a detailed description of his assailants to the police. Two or three days later he went to the police station and picked out the photographs of defendant and Heedley from a group of eight pairs of "mug shots." At trial, Fisher unequivocally identified defendant and Heedley as the men who had robbed him. Defendant now argues that the identification procedure was unfair because the photographs of himself and Heedley had a gray background while the others had a white background, and were dated July 1968 while the others were dated March 1968. But Fisher testified that the police officers merely asked him to examine the group of photographs and determine if any resembled his assailants; that he looked only at the faces and did not notice any differences in date or background color; and that the whole process took no more than a few minutes. Further, the officer on duty testified that in selecting the photographs to be shown to Fisher he tried to choose persons of relatively similar appearance, and gave no attention to any slight differences in date or background color; the shade of the background, he explained, will vary according to such factors as the film, processing, and photographic equipment used. In these circumstances the identification procedure was not "so impermissibly suggestive as to give rise to a very substantial likelihood, of irreparable misidentification" (*Simmons* v. *United States* (1968) 390 U.S. 377, 384 [19 L.Ed.2d 1247, 1253, 88 S.Ct. 967]), and the trial court correctly so ruled.

The information charged defendant with robbery of "a person who was then and there performing his duties as operator of a motor vehicle used for the transportation of persons for hire." The evidence supported that allegation, and the jury specifically found it to be true. Robbery of such a victim is declared by statute to be robbery in the first degree. (Pen. Code, § 211a.) ■ ■ Nevertheless, the information further charged that at the time of the commission of the offense defendant "was armed with a

---

verdict in any measurable degree. But the contents of the letter were actually of little if any relevance to the robbery prosecution: the People's principal witness never contended that defendant personally carried a gun during the robbery; and as will appear, the crime was first degree robbery as a matter of law by reason of the nature of the victim, regardless of whether defendant or his accomplice was armed. Defendant's counsel also points out that Heedley produced an alibi witness and the jury was unable to agree as to his guilt, and argues "it is not unreasonable to believe" that defendant could have testified to an equally persuasive alibi. But there may well be a substantial difference between the persuasiveness of the testimony of a convicted felon charged with the crime in issue and that of a third party not involved in the proceeding, and there is no indication that defendant could have put on such a witness to speak in his behalf.

deadly weapon, to wit, a .22 caliber automatic pistol." The evidence is undisputed that throughout the robbery it was Heedley, not defendant, who carried this gun and used it to threaten the victim into compliance with his demands. Yet the jury also found true the allegation that defendant was armed, and the judgment so recites. By supplemental brief filed in this court, defendant asks that the latter finding be stricken from the judgment "or at least made only applicable to section 1203, Penal Code."

As we pointed out in *People* v. *Floyd* (1969) 71 Cal.2d 879 [80 Cal. Rptr. 22, 457 P.2d 862], a finding that a defendant was armed with a deadly weapon at the time of the offense may have three consequences in addition to its bearing on the degree of the crime itself: (1) the minimum term of imprisonment for the crime is fixed at two years or more (Pen. Code, § 3024); (2) an additional punishment of five years' minimum imprisonment is imposed, to be served consecutively (Pen. Code, § 12022; see also § 12022.5, eff. Nov. 10, 1969); and (3) probation will ordinarily be denied upon conviction of any future offense (Pen. Code, § 1203).

In the case at bar, the finding that defendant was armed cannot have the first and second consequences mentioned. The judgment also decreed that "The Court fixes the minimum term at six months, pursuant to Section 1202b, Penal Code." That section provides that in any noncapital felony case in which the defendant was under the age of 23 years at the time of commission or apprehension, "the court may, notwithstanding any other provision of law fixing or affecting the penalty for the offense or offenses, specify that the minimum term of imprisonment for the offense or the offenses cumulatively shall be six months." Section 1202b is a special act which prevails over all general statutes (*In re Ward* (1964) 227 Cal. App.2d 369, 374-375 [38 Cal.Rptr. 650]); a fortiori is this true when, as here, it was enacted subsequent to the operative provisions of the other relevant statutes "fixing or affecting the penalty" (i.e., Pen. Code, §§ 3024 and 12022). We conclude that by invoking section 1202b the court impliedly declared sections 3024 and 12022 inapplicable to this defendant.

Despite defendant's apparent concession, section 1203 will likewise be inapplicable to him, but for a different reason. As noted above, the evidence is undisputed that defendant was not *personally* armed during this robbery. Since 1949, the exclusion of section 1203 has applied only to a defendant who was "himself" armed with a deadly weapon, and in *People* v. *Perkins* (1951) 37 Cal.2d 62 [230 P.2d 353], we held the statute inapplicable to a robber who was not thus armed but simply acted in concert with one who was. (Accord, *People* v. *Williams* (1970) 2 Cal.3d 894, 910-911

[88 Cal.Rptr. 208, 471 P.2d 1008].)[4] Although the finding in the case at bar that defendant was "armed as alleged" does not specifically add the phrase, "within the meaning of section 1203 of the Penal Code," it should nevertheless be stricken to avoid future confusion on this point.

The judgment is modified by striking therefrom the words, "and that defendant was armed as alleged"; as modified, the judgment is affirmed.

Wright, C. J., McComb, J., Peters, J., Tobriner, J., Burke, J., and Sullivan, J., concurred.

Appellant's petition for a rehearing was denied June 3, 1971.

---

[4]Similarly, sections 3024 and 12022 apply only to a defendant who was *personally* armed with a deadly weapon. (*People* v. *Snyder* (1969) 276 Cal.App.2d 520, 526-527 [80 Cal.Rptr. 822], and cases cited.) This rule would control in the present case but for the fact that the trial court invoked the ameliorative provisions of section 1202b, discussed above.