[L.A. No. 29939. In Bank. July 17, 1972.]

ALFRED RAY BRYAN, a Minor, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

576

## COUNSEL

Peter Bull, Robert L. Walker, Edward Steinman and Lawrence R. Young for Petitioner.

No appearance for Respondent.

Joseph P. Busch, District Attorney, Harry Wood, Robert J. Lord, Arnold T. Guminski and Daniel L. Bershin, Deputy District Attorneys, for Real Party in Interest.

## OPINION

**WRIGHT, C. J.**—Alfred Ray Bryan seeks extraordinary writs to restrain pending criminal proceedings against him and to mandate further juvenile court proceedings in connection with the charged crime.

Respondent, sitting as a juvenile court in prior proceedings, found that petitioner was within its jurisdiction because he admitted committing an unlawful killing when he was 16 years old. (Welf. & Inst. Code, § 602.)[1] The court committed him to the Youth Authority but the authority refused to accept the commitment and petitioner was returned for further juvenile

---

[1]Unless otherwise stated section numbers in this opinion refer to sections of the Welfare and Institutions Code, which includes the Juvenile Court Law (§§ 500-945) and the Youth Authority Act (§§ 1700-1906).

proceedings. (§§ 780, 1737.1.) The court then found that petitioner was not a proper subject to be dealt with under the Juvenile Court Law and ordered his prosecution under the general criminal law. This finding and order were made pursuant to that portion of section 707 which provides that "if . . . a minor who was 16 years of age or older at the time of the commission of an offense and who was committed therefor by the [juvenile] court to the Youth Authority, is returned to the court by the Youth Authority . . . , the court may make a finding . . . that the minor is not a fit and proper subject to be dealt with under [the Juvenile Court Law] . . . , and the court shall direct the district attorney . . . to prosecute the person under the applicable criminal statute . . . ."

In support of his applications for a writ of prohibition to restrain the prosecution for murder and a writ of mandate to compel the juvenile court to reconsider its determination that he is not amenable to its treatment, petitioner contends that the provisions of section 707 quoted above are unconstitutional. He argues that the provision purports to permit a second subjection to jeopardy of a criminal prosecution after a final disposition of a juvenile court proceeding which resulted in a first subjection to jeopardy for the same offense. Petitioner further contends that the Youth Authority's rejection of his commitment and the juvenile court's ensuing determination that he was not a proper subject for treatment under the Juvenile Court Law are based on an impermissible and mechanical application of a categorical policy of the Youth Authority Board instead of on the individualized evaluation required by statutory and decisional law.

For the reasons hereafter stated we reject petitioner's contentions but, for the guidance of court and counsel in the pending criminal prosecution, we explain that in that prosecution evidence of admissions made by petitioner in the juvenile court proceedings cannot be used against him.

### History of the Proceedings

In 1969 when petitioner was 16 years old petitions were filed in the juvenile court, the first alleging that he murdered Jerry Maddox and the second alleging that he assaulted F. X. Benavidez with intent to commit murder. The juvenile court found that he was not amenable to the treatment available through its facilities. It made this finding without having evaluated all the evidence concerning petitioner's case which was presented to it. In *Alfred B.* v. *Superior Court* (1970) 3 Cal.3d 718 [91 Cal.Rptr. 605, 478 P.2d 37], we held that the juvenile court must reevaluate petitioner's fitness for treatment as a juvenile on the basis of the entire record of his case considered in light of factors set out in *Jimmy H.* v. *Superior Court* (1970) 3 Cal.3d 709 [91 Cal.Rptr. 600, 478 P.2d 32].

On March 23, 1971, the juvenile court conducted a three-stage hearing, first on the issue of fitness, then on the issue of jurisdiction, and finally on the issue of disposition. By stipulation the evidence on the reconsideration of fitness consisted of the transcript of the 1969 fitness hearing, the reports concerning petitioner which had been prepared in 1969, and a further probation officer's report which was dated March 31, 1971, but which was based on the 1969 materials. The court found that petitioner was a proper subject to be dealt with under the Juvenile Court Law.

On the jurisdictional issue the court first, in response to an unopposed motion of petitioner's counsel, dismissed the petition charging aggravated assault. It then read the murder charge to petitioner and advised him of his rights to remain silent, to have a hearing and require proof beyond a reasonable doubt, to confront and cross-examine the witnesses against him, and to subpoena witnesses on his own behalf. Petitioner and his counsel waived further time to prepare for the jurisdictional hearing and petitioner expressed his understanding that his admission of the allegations of the petition would waive the constitutional rights which had been explained by the court and that the court, upon such admission, would commit him to the Youth Authority. The court accepted his limited admission that he "killed Jerry Maddox."

Petitioner's counsel next waived any right to an additional probation report and additional time to prepare for the dispositional hearing. The court found that the allegations of the section 602 petition were true, adjudged petitioner a ward, and committed him to the Youth Authority.[2]

The Youth Authority's case services supervisor, Mr. Holler, and his staff reviewed the records and reports of petitioner's history which had been before the court. By letter of April 22, 1971, Mr. Holler advised the juvenile court that the authority would not accept its commitment of

---

[2]We note that the procedure of March 23, 1971, with the judge conducting a jurisdictional hearing immediately after he concluded a fitness hearing at which he considered psychiatric and social reports containing material that was legally incompetent on the issue of jurisdiction, did not give rise to error similar to that condemned in *In re Gladys R.* (1970) 1 Cal.3d 855, 861 [83 Cal.Rptr. 671, 464 P.2d 127], and cases there cited.

In those cases, contrary to statute (§§ 701, 702, 706), the judge considered the social study bearing on the minor's disposition before he conducted the jurisdictional hearing. Because the jurisdictional fact of the minor's violation of a criminal statute was disputed and the social study contained material which was incompetent and prejudicial to the determination of the jurisdictional issue, the error required reversal.

Petitioner here, on the other hand, admitted the fact on which the juvenile court's jurisdiction was based. Moreover, he agreed to the procedure by which the issue of jurisdiction was considered immediately after the issue of fitness. Thus we do not have a situation in which fairness might well preclude a judge from presiding at a disputed jurisdictional hearing after he had conducted a fitness hearing.

petitioner. The letter summarized petitioner's history, pointed out that the authority's normal period of control over petitioner would expire in two and one-half years when he became 21 years old, and stated that policy established by the Youth Authority Board required at least two years' institutionalization of wards committed for offenses involving violence. The letter concluded that the predicted six months which would remain for petitioner's adjustment and treatment on parole would be "totally inadequate. . . . Our initial review of this case leads us to believe the ward has the potential for a successful treatment program within the Youth Authority. However, we do not believe it can be achieved within the time available."

At a further juvenile court hearing on May 26, 1971, testimony of Mr. Holler elaborated the bases of the authority's refusal to accept the court's commitment of petitioner. The court determined that since the authority would not accept petitioner and since no other juvenile court programs appropriate to his case were available, it had no alternative under section 707 except to transfer him for prosecution under the general criminal law.

### *Application of the Double Jeopardy Bar to Transfers Under Section 707*

Section 707 provides that the juvenile court may transfer to the criminal court a minor who is accused of crime and who is found unfit for juvenile court treatment (cl. 1) "At any time *during a hearing* upon a petition alleging that a minor is, by reason of violation of any criminal statute or ordinance, a person described in Section 602" or (cl. 2, under which the court acted in petitioner's case) "if, *at any time after such a hearing,* a minor who was . . . committed . . . to the Youth Authority, *is returned to the court* by the Youth Authority pursuant to section 780[3] or 1737.1.[4]" (Italics added.)

---

[3]Section 780 provides that "If any person who has been committed to the Youth Authority appears to be an improper person to be received by or retained in any institution or facility under the jurisdiction of the Youth Authority or to be so incorrigible or so incapable of reformation under the discipline of any institution or facility under the jurisdiction of the Youth Authority as to render his retention detrimental to the interests of the Youth Authority, the Youth Authority may return such person to the committing court. . . ."

[4]Section 1737.1 provides that "Whenever any person who has been charged with or convicted of a public offense and committed to the Authority appears to the Authority, either at the time of his presentation or after having become an inmate of any institution . . . of the Authority, to be an improper person to be retained in any such institution . . . , or to be so incorrigible or so incapable of reformation under the discipline of the Authority as to render his retention detrimental to the interests of the Authority and the other persons committed thereto, the Authority may return him to the committing court. . . . In the case of a person who has been com-

After the enactment of those provisions for transfer we decided in *Richard M.* v. *Superior Court* (1971) 4 Cal.3d 370 [93 Cal.Rptr. 752, 482 P.2d 664] that the constitutional bars against twice being placed in jeopardy for the same offense (U.S. Const., Amend. V; Cal. Const., art. I, § 13) apply to juveniles. ■ Therefore, we must now determine whether the statutory provisions for transfer are in accord with the protection of the guarantees against double jeopardy. A fundamental policy underlying those guarantees is that " 'the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty.' " (*Benton* v. *Maryland* (1969) 395 U.S. 784, 795-796 [23 L.Ed.2d 707, 716-717, 89 S.Ct. 2056], quoting from *Green* v. *United States* (1957) 355 U.S. 184, 187-188 [2 L.Ed.2d 199, 204-205, 78 S.Ct. 221, 61 A.L.R.2d 1119].)

■ The courts have traditionally recognized, however, that the double jeopardy bar does not protect a person charged under the criminal law from all harassment of repetitive proceedings. Thus the concept that jeopardy does not attach until the accused is placed on trial permits the vexation of repeated defective preliminary proceedings. (*United States* v. *Levy* (1925) 268 U.S. 390, 393 [69 L.Ed. 1010, 1011, 45 S.Ct. 516]; *Collins* v. *Loisel* (1923) 262 U.S. 426, 431 [67 L.Ed. 1062, 1064, 43 S.Ct. 618]; *Ex parte Fenton* (1888) 77 Cal. 183 [19 P. 267].) Moreover, "a concept of continuing jeopardy that has application where criminal proceedings against an accused have not run their full course" permits retrial and exposure to the risk of a second conviction after a former conviction is set aside for error prejudicial to the accused. (*Price* v. *Georgia* (1970) 398 U.S. 323, 326 [26 L.Ed.2d 300, 303, 90 S.Ct. 1757]; *United States* v. *Ball* (1896) 163 U.S. 662, 672 [41 L.Ed. 300, 303, 16 S.Ct. 1192].)

A related concept of continuing jeopardy was invoked in *In re Gary J.* (1971) 17 Cal.App.3d 704 [95 Cal.Rptr. 185], upholding the constitutionality of the provision of our Juvenile Court Law (§ 707, first clause) which permits transfer for prosecution under the general criminal law "[a]t any time during a hearing upon a petition alleging that a minor is, by

---

mitted to the Authority by a juvenile court, the juvenile court to which he is returned may make such further order or commitment with reference to such person as may be authorized by the juvenile court law, except that said court may not recommit such person to the Youth Authority."

reason of violation of any criminal statute . . . , a person described in Section 602."[5] The transfer order in *In re Gary J.* was made at the dispositional stage of the hearing after the jurisdictional hearing resulted in a finding that the allegations of the section 602 petition were true. The Court of Appeal recognized that jeopardy attached when the jurisdictional hearing was "entered upon." (See *Richard M.* v. *Superior Court, supra,* 4 Cal.3d at p. 376.) It held, however, that "no *new* jeopardy has arisen by the proceedings sending the case to the criminal court. The entire Juvenile Court Law contemplates a careful determination, on a case-by-case basis [footnote omitted], as to the type of procedure most likely to protect society and to rehabilitate the minor. Under some circumstances, a minor will go from the criminal court to the juvenile court; in other cases he will go from the juvenile court to the criminal court. But, until one court or the other reaches a final disposition of the case, only a single jeopardy is involved." (17 Cal.App.3d at p. 710.)[6]

[5]This clause of section 707 was enacted in 1961 as part of an overall revision of our Juvenile Court Law. The 1960 Report of the Governor's Special Study Commission on Juvenile Justice which led to that revision proposed that the revised statute should protect juveniles from "the inequitable use of double jeopardy," although at that time it was thought that such protection was not constitutionally required because juvenile court proceedings were not criminal prosecutions. (See *People* v. *Silverstein* (1953) 121 Cal.App.2d 140, 142-143 [262 P.2d 656]; disapproved in *Richard M.* v. *Superior Court, supra,* 4 Cal.3d 370, 375-376.)

Application of the concept of "continuing jeopardy" was suggested (although not in those words) by the commission's recommendation that the revised statute should "[p]rohibit minors from being subject to criminal prosecution based on the facts giving rise to a juvenile court petition once final judgment has been made in the juvenile court, *except that a finding of unfitness in the juvenile court shall not constitute final judgment in the terms of this recommendation.*" (Recommendation No. 6; italics added.)

To implement this recommendation the commission proposed and the Legislature enacted section 606, which provides that "When a petition has been filed in a juvenile court, the minor who is the subject of the petition shall not thereafter be subject to criminal prosecution based on the facts giving rise to the petition *unless* the juvenile court finds that the minor is not a fit and proper subject to be dealt with under [the Juvenile Court Law] . . . and orders that criminal proceedings be resumed or instituted against him." (Italics added.)

The commission further recommended that a juvenile court's order transferring the minor for criminal prosecution should be made at the dispositional stage of the proceedings (proposed § 725, subd. (c)) but the Legislature's 1961 revision permitted such transfer "[a]t any time during a hearing [on a section 602 petition charging a crime]." (§ 707.)

The provision permitting transfer after a minor is returned to the court by the Youth Authority was added to section 707 in 1965 at the behest of the California Probation, Parole and Correctional Association. (Review of Selected 1965 Code Legislation (Cont. Ed. Bar) pp. 282-283.)

[6]Compare *People* v. *Brown* (1970) 13 Cal.App.3d 876, 881 [91 Cal.Rptr. 904], and *People* v. *McFarland* (1971) 17 Cal.App.3d 807, 815 [95 Cal.Rptr. 369], both holding that the double jeopardy clause does not bar a criminal prosecution ordered by the juvenile court after it heard evidence as to jurisdiction under a section 602

We agree with *In re Gary J.'s* application of the concept of continuing jeopardy and reject the view that once legal jeopardy has attached at the jurisdictional stage of the juvenile court proceedings, a transfer of the minor for criminal prosecution is constitutionally forbidden.[7]

The transfer order in petitioner's case, however, was made at a later stage of the proceedings than the transfer order upheld in *In re Gary J.* In the matter before us the juvenile court first made a dispositional order committing petitioner to the Youth Authority and made its ensuing transfer order only after the authority refused to accept the commitment. Petitioner urges that his commitment to the Youth Authority was a final disposition of his case which, by virtue of the double jeopardy clause, precluded further prosecution for the same offense in the adult court. A dictum in *In re Gary J.* states that once the juvenile court has made a dispositional order, "both section 606 [of the Juvenile Court Law] and the Constitution [the double jeopardy clause] would prohibit a renewal of the case in another court." (17 Cal.App.3d at p. 710.)[8]

The dispositional order of commitment to the Youth Authority was "final," however, only in the limited sense that it was appealable. (§ 800.) The court's determination that petitioner should be committed to the au-

---

petition alleging murder, then heard evidence as to fitness, and thereafter found that the minors were persons described in section 602 but were not fit for juvenile court treatment. *Brown* states that the consequence of the transfer order in those circumstances "is not to permit criminal proceedings to be brought against one who has already suffered deprivation of liberty as a result of a determination of wardship; rather, it is to divert the 'unfit' minor into a procedural stream which may result in criminal punishment but not in renewed detention as a juvenile." *McFarland* describes the juvenile court proceedings as "limited and preliminary in disposition."

Although we are in accord with the *Brown* and *McFarland* holdings on the double jeopardy issue, we withhold approval from statements in those cases construing our Juvenile Court Law to require that a transfer order be made not after juvenile court jurisdiction has been established but *during* the jurisdictional hearing.

[7]See *United States* v. *Dickerson* (D.D.C. 1958) 168 F.Supp. 899, 903, reversed, 271 F.2d 487 [106 App.D.C. 221]; *Hultin* v. *Beto* (5th Cir. 1968) 396 F.2d 216; *Garza* v. *State* (Tex.Crim.App. 1963) 369 S.W.2d 36; Model Rules for Juvenile Courts (Nat. Council on Crime Delinquency 1969) rule 9; Family and Juvenile Court Acts (U. S. Gov. Printing Office, Children's Bureau Publication No. 472, 1969) § 27; Uniform Juvenile Court Act (Handbook of Nat. Conference of Commissioners on Uniform State Laws 1968) § 34, subd. (a), p. 270; Antieau, *Constitutional Rights in Juvenile Courts* (1961) 46 Cornell L. Q. 387, 397.)

[8]The suggestion of the Court of Appeal that the Juvenile Court Law itself, without constitutional compulsion, can be read to prohibit a transfer after the juvenile court has made a dispositional order of commitment to the Youth Authority must be rejected. Section 606 does not purport to deal with the stage of juvenile court proceedings at which a transfer order may be made, whereas the later enacted clause of section 707 with which we are here concerned expressly provides that such an order may be made after commitment to and rejection by the Youth Authority.

thority was necessarily tentative in nature under our statutory scheme since the authority is expressly empowered to refuse such a commitment. (§ 780, quoted *ante*, fn. 3; § 1737.1, quoted *ante*, fn. 4; cf. *People* v. *Ralph* (1944) 24 Cal.2d 575, 583 [150 P.2d 401]; *In re Ralph* (1946) 27 Cal.2d 866, 870 [168 P.2d 1].) Thus the jeopardy to which a minor is subjected in juvenile court proceedings which follow the course of those here under consideration is not terminated by the court's tentative decision to commit the minor to the Youth Authority. No new jeopardy attaches when the juvenile court, after the authority refuses to accept a minor, transfers him to the criminal court. This application of section 707 comports both with constitutional concepts and with the legislative intent that the Youth Authority, in light of its familiarity with its own facilities and programs, shall have power to balance the interests of the particular minor, of society, and of the overall operation of the authority, and determine that the minor should or should not be accepted by the authority.

We point out also that to forbid transfer after the authority's rejection of a commitment would discourage the juvenile court from tentatively committing one such as petitioner to the authority for the benefits of possible treatment as a juvenile. If the juvenile court judge knew that commitment to and rejection by the authority of a juvenile would place the minor in a position where he could not be prosecuted as an adult, the judge might well be reluctant to resolve in favor of the minor any doubts as to the propriety of a tentative juvenile court commitment when to do so would risk the possibility that the minor, although he had committed a crime of violence, would be neither effectively treated as a juvenile nor punished as a criminal.[9] (See Review of Selected 1965 Code Legislation (Cont. Ed. Bar) p. 282, explaining that it was this possibility which led to the enactment of the 1965 amendment of section 707 empowering the juvenile court to transfer a minor rejected by the authority.)

We conclude for the foregoing reasons that the double jeopardy bar does not preclude the prosecution of petitioner under the general criminal law.

*Lawfulness of the Criteria Underlying the Youth Authority's Rejection of Petitioner and the Juvenile Court's Transfer Order*

 Petitioner contends that the Youth Authority without considering the facts of his case rejected him solely on the basis of its mechanical ap-

---

[9]We do not suggest approval of the procedure, purportedly permitted by section 707, whereby a juvenile committed to and accepted by the authority could later be prosecuted in the criminal court if the authority, after a period of treatment, decided to return him to the juvenile court.

plication of the Youth Authority Board's policy requiring two years' institutionalization of all minors committed for violent offenses such as murder. Moreover, he urges, the juvenile court's later determination that he would not be amenable to the treatment available through the facilities of that court rests on its automatic acceptance of that arbitrary criterion. We adhere to and reemphasize the concept basic to our Juvenile Court Law that each minor must be considered as an individual, but we reject petitioner's contention that he did not receive individualized consideration.

"Nothing could be further from the spirit of the [juvenile court] law than the absorption of the individual into a stereotype." (*In re William M.* (1970) 3 Cal.3d 16, 31 [89 Cal.Rptr. 33, 473 P.2d 737].) Thus in *In re William M.* we denounced a detention order based on a judge's mechanically applied policy of detaining all juveniles who were accused of the sale of marijuana. In *Jimmy H. v. Superior Court, supra,* 3 Cal.3d 709, 715, we held that when the possible need of treatment beyond the age of majority is the determinative factor in a juvenile court's decision to transfer a minor as unfit for treatment as a juvenile, the transfer order must be supported by substantial evidence that successful treatment of the particular minor may require the extra time. Recognizing the need for individualized consideration the Legislature has specifically forbidden the juvenile court to base a finding of unfitness on "the offense, in itself," or on the juvenile's "denial . . . of any or all of the facts or conclusions set forth [in a section 602 petition] . . . or of any inference to be drawn therefrom." (§ 707.)

The Juvenile Court Law's premise of particularized treatment of each juvenile would be set at naught if the Youth Authority could reject juvenile court commitments on the basis of mechanical, categorized "policies." The Legislature's description of the authority's discretion to accept or reject a person committed by the juvenile court is broad and general. It shall accept such a person "if it believes that the person can be materially benefited by its reformatory and educational discipline, and if it has adequate facilities to provide such care." (§ 736.) It may return such a person to the committing court if he "appears to be an improper person to be received" in its facilities or "so incorrigible or so incapable of reformation . . . as to render his retention detrimental to the interests of the Youth Authority." (§ 780.)

Guided by the foregoing broad but constitutionally sufficient standards (cf. *In re Herrera* (1943) 23 Cal.2d 206, 211 [143 P.2d 345]), the Director of the Department of the Youth Authority and the Youth Authority Board formulate policies as to the exercise of their powers and duties. (§ 1711.3.) The director's power to accept or reject cases submitted by the courts for

commitment to the authority is delegated to the case services supervisor. (See Youth Authority Board Policy Manual (as revised Nov. 1, 1971) §§ 02, 10; Criteria and Procedure for Referral of Juvenile Court Cases (June 1971) p. 4.)

As we have indicated the supervisor in his letter to and testimony before the juvenile court in petitioner's case explained that among the criteria adopted by the board is the policy that youths committed for violent homicides shall be institutionalized for at least two years. From the supervisor's letter and testimony, however, it does not appear that the authority's rejection of petitioner rested on a mechanical application of this policy without regard to petitioner's individualized history. On the contrary, the supervisor and his staff reviewed all the records of that history as well as the records of the circumstances of the crime. Among the factors which they considered aside from the circumstances of the crime itself were petitioner's history of glue-sniffing and use of alcohol and the lack of home environment where he could find acceptable support. These and various other matters were sufficient to support the supervisor's conclusion that in petitioner's particular case, implementation of the two-year-institutionalization policy would afford the authority insufficient time within which to train, treat and otherwise rehabilitate petitioner on parole before his mandatory discharge date. (See § 1700.)

Thus neither the authority in its determination to reject petitioner nor the court in its ultimate determination to transfer him for adult prosecution applied a mechanical approach to the exclusion of petitioner's individual history, characteristics, and circumstances. No sufficient reason appears to challenge either determination on its merits.

### Inadmissibility in Criminal Proceedings of Minor's Admissions Made in Connection with Juvenile Court Proceedings

■ No California statute governs the use against a minor in a criminal prosecution ordered by the juvenile court of his admissions made in connection with the juvenile court proceedings.[10] As we shall explain, however,

---

[10]The juvenile court laws of many other jurisdictions provide that admissions and evidence received in juvenile court shall not be used against the minor in other courts. (See 1 Wigmore, Evidence (3d ed.) § 196, p. 673.)

Although the 1960 report of the Study Commission on Juvenile Justice contains the general, unelaborated statement that under the commission's proposed revision of California's Juvenile Court Law "the information disclosed at the juvenile court hearing in certified cases would be permitted to be considered in the criminal courts" (Recommendation No. 6), the commission did not propose and the Legislature did not enact any statute dealing with the subject.

evidence of admissions made by a minor to the juvenile judge or the juvenile probation officer should be excluded in a criminal prosecution, for allowing this evidentiary use of the admissions would frustrate the protective and rehabilitative philosophy of the Juvenile Court Law and would deny to the minor the protection of exclusionary rules which apply to all persons charged with the commission of crimes in comparable circumstances.

The minor may be well-advised to make frank admissions concerning the alleged crime both to the juvenile court and to the juvenile probation officer who prepares the social study which must be received in evidence at the dispositional hearing (§§ 581, 706) and the report on behavioral patterns which must be considered at the transfer hearing (§ 707). To use these admissions against a minor in a subsequent criminal prosecution would discourage candor and contrition, factors which might properly influence the probation officer's recommendation and the juvenile court's decision as to disposition.

As to defendants convicted in a criminal court we have enunciated rules that "admissions made to a probation officer in the hope that candor will persuade the probation officer to make a favorable report to the court are not admissible either for substantive evidence or for impeachment in any retrial on the same issues" (*People* v. *Harrington* (1970) 2 Cal.3d 991, 999 [88 Cal.Rptr. 161, 471 P.2d 961]) and "admissions made to a trial judge at the direction or suggestion of a probation officer in the hope that candor will persuade the judge to grant probation are inadmissible as substantive evidence or for impeachment in any later proceeding against him" (*People* v. *Hicks* (1971) 4 Cal.3d 757, 762 [94 Cal.Rptr. 393, 484 P.2d 65]). These rules implement the beneficial purpose of the probation interview. As stated in *People* v. *Garcia* (1966) 240 Cal.App.2d 9, 13 [49 Cal. Rptr. 146, 15 A.L.R.3d 1352], quoted approvingly in *Hicks*, "in order [for the probation officer] to get full cooperation from a defendant he should be advised that any statement he makes will be used only for the information of the court in a probationary hearing. We do not doubt that defendants have that belief and that if they knew their damaging admissions could be used against them in another trial they would not talk freely and the purpose of the interview would be frustrated."

The importance of a close relationship of the minor to the probation officer in the juvenile court process is at least as important as that of the defendant to the probation officer in the penal process. (Cf. *In re Gladys R.* (1970) 1 Cal.3d 855, 860, fn. 7 [83 Cal.Rptr. 671, 464 P.2d 127].) The minor who is subject to the possibility of a transfer order should not be

put to the unfair choice of being considered uncooperative by the juvenile probation officer and juvenile court because of his refusal to discuss his case with the probation officer, or of having his statements to that officer used against him in subsequent criminal proceedings. (Cf. *In re Paul T.* (1971) 15 Cal.App.3d 886, 894 [93 Cal.Rptr. 510].) Refusal to apply the exclusionary rules of *Harrington* and *Hicks* to the admissions of juveniles transferred for criminal prosecution would be flagrantly discriminatory.[11]

Also pertinent to the criminal prosecution of a minor transferred by the juvenile court is the rule that "Evidence of a plea of guilty, later withdrawn, or of an offer to plead guilty to the crime charged or to any other crime, made by the defendant in a criminal action is inadmissible in any action or in any proceeding of any nature . . . ." (Evid. Code, § 1153.) Underlying this exclusionary rule is the policy favoring the settlement of criminal cases. (*People* v. *Quinn* (1964) 61 Cal.2d 551, 555 [39 Cal.Rptr. 393, 393 P.2d 705].) Such settlements may benefit both the state and the defendant. (*People* v. *West* (1970) 3 Cal.3d 595, 604-605 [91 Cal.Rptr. 385, 477 P.2d 409].)

Similarly the state and the minor who appears in juvenile court charged with crime may profit if the minor can make admissions as to the allegations of the section 602 petition without fear that his statements may be used against him if he is transferred for criminal prosecution. The facts as to the minor's admission in the juvenile court proceeding before us illustrate the need of an exclusionary rule which will afford the juvenile protection comparable to that furnished criminal defendants by Evidence Code section 1153. The section 602 petition alleged that the minor "did wilfully, unlawfully and with malice aforethought murder Jerry Maddox." Although the court's finding entered in the minutes was that the minor "admits the allegations of the petition," the colloquy quoted in the margin from the reporter's transcript[12] shows that he admitted at most an unlawful killing,

---

[11]In *People* v. *Magee* (1963) 217 Cal.App.2d 443, 456-457 [31 Cal.Rptr. 658], quoted in *People* v. *Lara* (1967) 67 Cal.2d 365, 385 [62 Cal.Rptr. 586, 432 P.2d 202], the Court of Appeal upheld the admissibility at a criminal trial of evidence of statements of the minor defendants to a juvenile probation officer. *Magee*, however, was decided before we announced the exclusionary rules of *Harrington, supra,* and *Hicks, supra;* it did not consider the policy favoring free communication between defendants and the probation officer; and therefore it is not persuasive here. (See *McDowell & Craig* v. *City of Santa Fe Springs* (1960) 54 Cal.2d 33, 38 [4 Cal.Rptr. 176, 351 P.2d 344].)

[12]"THE COURT: . . . Does the Minor admit or deny the allegation [of the section 602 petition]?
"MR. YOUNG [counsel for the minor]: The Minor admits the allegation, your Honor.
"THE COURT: Is that true?
"THE MINOR: Correct. . . .
"THE COURT: . . . You understand also that it is not only a probability, but it is

not a murder, and that his admission was made on the condition that he would be committed to the Youth Authority as a juvenile. This limited admission benefited the state by eliminating the need for a contested jurisdictional hearing since the reports of a psychiatrist and a clinical social worker who examined the minor indicate that there may be serious questions as to diminished capacity. The admission benefited the minor by assuring his tentative commitment to the Youth Authority. To permit the use of the admission against him at a criminal trial after the Youth Authority refused to accept his commitment as a juvenile would invidiously deny him the protection afforded in comparable circumstances by Evidence Code section 1153 and the provision of Penal Code section 1192.5 that if a guilty plea specifying punishment is rejected it "may not be received in evidence in any criminal, civil or special action or proceeding of any nature . . . ." The petitioner's admissions, accordingly, may not be received in evidence in any criminal proceedings.

The alternative writ heretofore issued is discharged and the petition for peremptory writs of mandate and prohibition is denied.

McComb, J., Peters, J., Tobriner, J., Mosk, J., Burke, J., and Sullivan, J., concurred.

---

my intention, on your admitting this matter, to commit you to the California Youth Authority. Do you understand that?

"THE MINOR: Yes, sir.

"THE COURT: That will be the consequence of your admitting.

"MR. YOUNG: Your Honor, for the record, I have indicated to Alfred Bryan that the admitting the allegation does not in any way indicate an admission of any particular degree of crime that might be appropriate in adult court, but that it does admit the substance of the allegation rather than the legal technicalities of whether this would be manslaughter, second degree, or first degree, and upon that understanding he admits the allegation.

"THE COURT: Very well. [¶] In other words, you do admit that you killed Jerry Maddox, a human being?

"THE MINOR: Yes, sir."