[No. D017124. Fourth Dist., Div. One. Nov. 23, 1993.]

THE PEOPLE, Plaintiff and Respondent, v.
ANNA JEANNETTE HUMISTON, Defendant and Appellant.

**[Opinion certified for partial publication.[1]]**

---

[1]Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts I, IV, V, VI, VII and VIII.

464

## Counsel

Lynda A. Romero, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Robert M. Foster and Douglas P. Danzig, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

HUFFMAN, J.—A jury convicted Anna Jeannette Humiston of conspiracy to commit murder (Pen. Code,[2] § 182, subd. (a)(1)) and first degree murder (§ 187, subd. (a)). The court sentenced Humiston to prison for 25 years to life on each count but stayed imposition of sentence on the conspiracy count under section 654 and ordered that she be housed at the California Youth

---

[2]All statutory references are to the Penal Code unless otherwise specified.

Authority (CYA).[3] In the published portion of this opinion, we hold the court properly allowed Humiston to be cross-examined with statements she made to mental health professionals in anticipation of a juvenile court fitness hearing and properly admitted evidence of Humiston's drug use since the age of 13. We further hold that although the court erred in admitting evidence Humiston used the number 187 on a pager to communicate with her coconspirator a year before the crime, such error does not require reversal.

In the unpublished portion of this opinion, we hold substantial evidence supports the verdict, the court properly admitted certain testimony as rebuttal evidence, the court properly restricted evidence of statements Humiston made to a rebuttal witness, commitment to CYA was proper, Humiston's sentence was not cruel and unusual punishment and the reasonable doubt instruction read to the jury is constitutional.

FACTS

About 7:30 a.m. on May 17, 1991, the body of Teresa Ann Holloway was found in a drainage ditch on the side of Highway 163 near San Diego's Balboa Park. The cause of death was determined to be blunt force head injuries and strangulation. Holloway's skull was shattered and her jaw was broken. Her injuries included numerous track-like abrasions on her face, arms, hands, legs and feet caused by a threaded device such as a pipe or scissors jack, lacerations on her head, a human bite mark on her back and ligature marks around her neck. The wounds showed Holloway was trying to cover herself as she was being hit. She also had hairs clutched in her fingers.[4] Holloway was 15 or 16 weeks pregnant.

The day before Holloway's body was found, 17-year-old Humiston telephoned her friend Melissa Andre and told her she had killed Holloway because Holloway got Humiston into a lot of trouble. Humiston said Holloway did not die fast enough and had struggled. She said she had straddled and punched Holloway while Humiston's boyfriend, Robert Jurado, choked her. Humiston said she did not think she would get caught. She asked Andre to go with her to see Holloway's body but they never went. In a later

---

[3]The minute order and the reporter's transcript for June 23, 1992, reflect the court stayed imposition of sentence on the conspiracy count, not the murder count as indicated by the abstract of judgment. The abstract of judgment must be corrected accordingly.

[4]Several of the hairs were later determined to be similar to those of Humiston.

conversation, Humiston told Andre that Robert would take the blame if they got caught. She also said if she did not get caught this time she would kill someone again.

That same morning, Humiston told her friend Mia Rodrigues that she and Jurado had killed a girl named Terry. She said Denise Shigemura had been driving Humiston's car while Jurado strangled Holloway. When Holloway would not die fast enough from strangulation, Jurado hit her over the head with a jack from the car until she died. Humiston told Rodrigues she saw the jack take off part of Holloway's face and that after the beating they left the body in a ditch. She also said she had held Holloway's arms down to prevent her from scratching Jurado's face. Humiston thought she might have broken Holloway's arm because she heard a "snap" while she was holding her. She said she did this to Holloway because Holloway had been threatening Humiston's family. She said there was no chance she would be caught for this murder. Humiston also told Rodrigues she had beaten Holloway up several months earlier.

On May 17, 1991, the police talked to Humiston and Jurado about Holloway's murder. Humiston said she hardly knew Holloway and had seen her only once or twice. However, the next day, the police arrested Humiston, Jurado and Shigemura after receiving information that Humiston had told Andre about the murder.

The events leading to Holloway's murder began in 1990. Humiston met Jurado in March 1990 when she was 16 years old and Jurado was 18 years old. They soon established a boyfriend-girlfriend relationship. Through Jurado, Humiston met Shigemura, Holloway and Brian Johnsen. Holloway and Johnsen, both drug users, lived together when Humiston met them but Johnsen made Holloway move out when Holloway became pregnant and refused to stop using drugs. Johnsen took in a roommate, Doug Mynatt. In March 1991, Johnsen introduced Mynatt to Jurado. Mynatt sold Jurado drugs which Jurado then resold.

By April 1991, several people, including Mynatt, Johnsen and Shigemura, were angry with Jurado for various reasons.[5] On one occasion, Mynatt and Johnsen forced Jurado to go to Johnsen's house where they confronted

---

[5]Johnsen was angry with Jurado because the police had searched Johnsen's house looking for a gun Jurado had stolen and found drugs belonging to Jurado. Jurado would not admit the drugs were his so Johnsen was arrested. Shigemura was angry with Jurado because she had

Jurado with their grievances. Because Jurado owed Mynatt some money for drugs, Mynatt initially threatened to beat him up but then agreed to supply him with more drugs to sell with the understanding the profit would be given to Mynatt.[6]

While Johnsen was in jail in May 1991 for reasons unrelated to the present crime, Mynatt began causing problems.[7] Johnsen decided Mynatt had to be killed. On May 14, 1991, Johnsen telephoned Shigemura and discussed his idea. He also told Shigemura he wanted to talk to Jurado about it. Shigemura used a three-way calling feature on the telephone to talk to Jurado at Humiston's house. Humiston answered the telephone and then Jurado took the call which lasted two hours and forty-four minutes. Jurado, Johnsen and Shigemura discussed killing Mynatt. Jurado acknowledged he had already been thinking about killing Mynatt himself. Jurado, Johnsen and Shigemura decided to keep Holloway out of their plan because she asked too many questions and was not a "good liar."

On Wednesday, May 15, 1991, Jurado, Shigemura and Holloway were at Jurado's apartment when Humiston arrived in her car between 7:30 and 8 p.m. Another friend, Mark Schmidt, also arrived and said Johnsen had telephoned Schmidt's apartment earlier and asked him to bring Jurado there so Johnsen could call back and speak to Jurado. They all went to Schmidt's apartment. When they got there, Humiston sat down on the floor and had a worried look on her face. Jurado and Shigemura went into the bedroom.

Johnsen telephoned and spoke to Jurado first. Jurado said he had to "take care of" Mynatt before Johnsen got out of jail. Johnsen agreed to let Jurado take care of Mynatt on his own. Johnsen then spoke to Shigemura. She warned him he had better speak to Holloway because Holloway apparently knew about the plan to kill Mynatt and had been asking a lot of questions.

Holloway then spoke to Johnsen. They talked about the plan to kill Mynatt. Meanwhile, Jurado whispered to Shigemura, saying Holloway was going to tell Mynatt what was being planned. Jurado said he wanted to kill Holloway to prevent her from "snitching." Jurado went into the living room and told Humiston "we're going to have to do Terry, take her out." Jurado made some chopping gestures with his hand and shook Humiston. Humiston looked upset or worried.

---

spent seven months in federal custody after being arrested on a military base for possessing drugs and weapons that belonged to Jurado.

[6]Johnsen testified at trial he was "pretty sure" Humiston was present during part of the discussion about Jurado's debt to Mynatt.

[7]For example, Mynatt had failed to pay Johnsen rent as promised, he was going through Johnsen's personal effects and riding Johnsen's motorcycle without a license. Mynatt also misplaced $450 and accused Shigemura of taking it, so he stole her purse.

In Humiston's presence, Jurado asked Schmidt for some "weed-eater wire," saying he needed it because Johnsen had asked him to secure his motorcycle. Schmidt gave Jurado some plastic wire and straps. Jurado wrapped the wire around his neck and said, "That will do." At this point, Holloway was still in the bedroom talking to Johnsen on the telephone.

Shigemura had to be back at the private furlough facility where she was staying by 9 p.m. Humiston and Jurado were going to drive her there. Humiston, Jurado and Shigemura yelled at Holloway to get off the telephone and come with them. Holloway did not want to go, saying she wanted to continue talking on the telephone to Johnsen and there was no reason she had to go. Finally, Schmidt told Holloway she had to leave because he was leaving also and had to lock the apartment.

After Jurado told Shigemura about the plan to kill Holloway, he said something to Humiston. Jurado and Humiston then approached Shigemura, and Jurado said Humiston did not want to drive. Jurado told Shigemura to drive. Standing within an arm's length of Humiston, Shigemura told Jurado he could not "do this, this is a friend." She said she did not want anything to do with killing Holloway. Jurado said he would "do it" after he dropped off Shigemura and would throw Holloway's body off Waring Road. Humiston was present when these statements were made. She handed Shigemura her car keys. Shigemura drove while Humiston sat in the back seat behind Shigemura, Holloway sat in the front passenger seat and Jurado sat behind Holloway.

Shigemura drove down 40th Street onto the freeway. A few minutes later, Jurado wrapped the plastic wire around his hands, leaned forward and began strangling Holloway. Holloway fought back and started to scream. Both Humiston and Shigemura yelled something like, "Rob, what are you doing?" and yelled at him to stop. After about a minute, Jurado pulled Holloway into the backseat with him and Humiston. The car was swerving and Holloway was screaming, "Why are you doing this to me, why are you doing this to my baby?" Shigemura heard Holloway being struck several times with fists. Jurado reached into the back of the car and got a scissors jack. Eventually, Humiston made her way to the front seat. By this time, Holloway was on the floor in the back and there was no sound coming from her.

Humiston's car began to break down. Jurado told Shigemura to pull over and Humiston offered to drive. Shigemura got out and walked around to the passenger side while Humiston slid over to the driver's seat. Humiston got the car moving back onto the freeway but the car soon experienced more problems and Humiston had to pull off to the side of the road. Humiston and

Shigemura got out, went to the back of the car and pretended they were changing a tire. Jurado pulled Holloway out of the car, dragged her three or four feet off the road and threw her into a drainage ditch. He then jumped into the ditch and began beating her with the jack, striking eight or nine blows. Sometimes he missed and the sound of the jack hitting concrete could be heard.

When Jurado came out of the ditch, he, Humiston and Shigemura pushed the car away from where they left the body. They left the car and walked up a freeway off-ramp to a 7-Eleven. On the way, Jurado threw the jack off the side of the road. Humiston, Shigemura and Jurado washed their hands with ice Shigemura had obtained inside the store. Jurado telephoned a friend, David Silva, to ask for a ride. While they waited for Silva, Jurado decided to go back to the car to get a wallet. While he was gone, Shigemura asked Humiston if she had hit Holloway. Humiston said, "Yeah, she pissed on me."

Silva arrived and drove Humiston, Jurado and Shigemura to Silva's girlfriend's apartment. Humiston, Jurado and Shigemura seemed "[k]ind of shaken, kind of stirred up a little bit." Humiston looked like she had been crying. Silva then drove Humiston home.

The next day, Humiston left her high school campus and drove her mother's car to Jurado's apartment where she met Jurado and Shigemura. Jurado telephoned a towing company and arranged to have Humiston's car towed from where they left it the night before. They drove to meet the tow truck there. There was blood on the passenger side door and the carpet of Humiston's car. Humiston watched as Shigemura cleaned off the blood and Jurado searched the car for Holloway's belongings. Humiston asked Shigemura to go with her to look at Holloway's body but Shigemura declined. Humiston set off on her own but did not get very far when the tow truck arrived and she returned to her car.

As the car was being towed to Jurado's apartment, Humiston joked with Shigemura about the murder. Shigemura asked Humiston whether she thought the murder was necessary and Humiston said yes, Holloway was a "snitch" and could have hurt Humiston. When they arrived at his apartment, Jurado paid the tow truck driver with money from Holloway's purse and Humiston signed a receipt.[8] Humiston and Shigemura then cleaned more blood off the car. Later that day, Humiston mentioned that Mynatt was going to hurt her family and expressed a desire to have him killed, saying "[l]et's take care of it."

---

[8] The tow truck driver testified at trial there was nothing unusual in their demeanor to cause him to become suspicious.

After Jurado threw some of Holloway's belongings in a dumpster, he, Humiston and Shigemura went to Humiston's house where they washed clothes, including Jurado's bloody shirt from the night before. The same day, Larissa Slusher and Ted Meyer passed by the dumpster used by residents of Jurado's apartment complex. Slusher had known Holloway for seven or eight months. The night before Holloway's murder, Slusher had loaned Holloway a dress which she put in her purse. Slusher and Meyer saw the dress in the dumpster. It was spread out, covering some of Holloway's possessions including her purse, wallet, driver's license, photographs of her child, Johnsen's driver's license and one sandal identical to one found with Holloway's body at the scene of the crime.

The next day, Humiston told Rodrigues that she and Jurado had the car towed and paid for the tow truck with money from Holloway's purse. Humiston said she did not feel bad about killing Holloway. She said she had tried to talk to Holloway about the threats Holloway had made to her family, so she did not feel "all that guilty." Humiston told Rodrigues she was getting a new car that day or the next and seemed happy and excited about it.

On Saturday, May 18, 1991, Humiston drove her new car to pick up Jurado and they went to Silva's house. Humiston, Jurado and Silva then drove to Jurado's apartment. As they arrived, the police pulled up and arrested Humiston and Jurado. Humiston showed the police where the jack used to murder Holloway had been thrown. Humiston, Jurado and Shigemura were charged with murder (§ 187, subd. (a)) and conspiracy to commit murder (§ 182, subd. (a)(1)).

Humiston testified at trial, denying any involvement in Holloway's murder. She denied knowing anything about the plot to kill Mynatt or why Jurado killed Holloway. She was upset the night of the murder because she thought Jurado and Shigemura were having an affair, not because she knew Holloway was about to be killed. Humiston admitted she disliked Holloway, in part because Holloway supplied Jurado with drugs.

Although Humiston admitted Jurado told her they were going to "take Terry out," she did not understand and thought Jurado meant he was going to beat Holloway up. Jurado said "Just forget it." When Jurado began to strangle Holloway in the car, Humiston tried to stop him but he threatened to kill her and ordered her to get in the front seat. Jurado then began to hit Holloway with his fists. As Humiston crawled into the front seat, Holloway grabbed her hair. Humiston hit Holloway once, to make her let go. She was not trying to help Jurado or to kill Holloway, but she knew at that point Holloway was being murdered. When her car broke down, she drove because Jurado threatened to kill her.

Humiston testified she was terrified of Jurado and Shigemura. After the murder, Humiston believed Jurado when he threatened to kill her if she told anyone. Humiston told her friends Andre and Rodrigues about the murder because she was afraid and "couldn't keep it in." She was afraid to tell her parents and hoped Rodrigues would tell them.

## DISCUSSION

### I*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### II

Humiston contends the court committed reversible error in allowing her to be cross-examined with statements she made to mental health professionals in anticipation of a juvenile court fitness hearing (Welf. & Inst. Code, § 707). She asserts the doctrine of use immunity should apply to preclude testimony given at a juvenile court fitness hearing from being used, both as substantive evidence and impeachment, in a subsequent criminal trial.

### A

Before trial, the defense sought to exclude statements Humiston had made to the probation officer and the psychologists who interviewed her for purposes of the juvenile court fitness hearing. Specifically, the defense claimed such evidence was precluded by the holdings in *Ramona R.* v. *Superior Court* (1985) 37 Cal.3d 802 [210 Cal.Rptr. 204, 693 P.2d 789] and *People* v. *Coleman* (1975) 13 Cal.3d 867 [120 Cal.Rptr. 384, 533 P.2d 1024]. The court declined to rule at that time based on the prosecution's representation none of the statements made in connection with the fitness hearing would be introduced in its case-in-chief.

During direct examination of Humiston, the defense renewed its request for a ruling on the admissibility of this evidence, arguing the prosecution should be precluded from cross-examining Humiston about any statements she made to the "professionals for the express purpose of them providing it to the probation officer" in connection with the fitness hearing. The prosecution agreed any statements Humiston made directly to the probation officer were precluded. However, the court determined the statements made to the psychologists were not judicially compelled within the meaning of

*See footnote, *ante*, page 460.

*Ramona R.* v. *Superior Court, supra,* 37 Cal.3d 802, and thus could be utilized during cross-examination as stated in *People* v. *Stanfill* (1986) 184 Cal.App.3d 577 [229 Cal.Rptr. 215].

B

█ Use immunity is a judicially declared rule of evidence based on the privilege against self-incrimination. (*People* v. *Coleman, supra,* 13 Cal.3d at pp. 878, 889; *Ramona R.* v. *Superior Court, supra,* 37 Cal.3d at pp. 806-807.) Its purpose is to alleviate the difficult testimonial choice a person must make in exercising his or her right to be heard at one judicial proceeding which risks giving the prosecution the unfair advantage of using that evidence on the issue of guilt at a later proceeding. (*People* v. *Coleman, supra,* 13 Cal.3d at p. 872; *Sheila O.* v. *Superior Court* (1981) 125 Cal.App.3d 812, 815 [178 Cal.Rptr. 418].) Use immunity was also meant to encourage complete candor on the part of the accused in order to assemble all available information relevant to an enlightened judicial determination. (*People* v. *Coleman, supra,* 13 Cal.3d at pp. 893-894; *In re Wayne H.* (1979) 24 Cal.3d 595, 599-600 [156 Cal.Rptr. 344, 596 P.2d 1].)

The Supreme Court sanctioned the rule of use immunity in the context of probation revocation proceedings when it held: "[U]pon timely objection the testimony of a probationer at a probation revocation hearing held prior to the disposition of criminal charges arising out of the alleged violation of the conditions of his probation, and any evidence derived from such testimony, is inadmissible against the probationer during subsequent proceedings on the related criminal charges, save for purposes of impeachment or rebuttal where the probationer's revocation hearing testimony or evidence derived therefrom and his testimony on direct examination at the criminal proceeding are so clearly inconsistent as to warrant the trial court's admission of the revocation hearing testimony or its fruits in order to reveal to the trier of fact the probability that the probationer has committed perjury at either the trial or the revocation hearing." (*People* v. *Coleman, supra,* 13 Cal.3d at p. 889.) Thus, the prosecution must produce sufficient evidence to establish the defendant's guilt before the defendant must decide whether to remain silent or to testify in his own behalf. (*Id.* at p. 876.) The court noted, however, that once a defendant elects to testify at trial, he must testify truthfully and remains liable to impeachment if his testimony on direct examination contradicts his testimony at his revocation hearing. (*Id.* at pp. 892-893, fn. 21.)

Use immunity rules, such as that announced in *Coleman,* have also been applied in other contexts. In *Tarantino* v. *Superior Court* (1975) 48 Cal.App.3d 465, 469 [122 Cal.Rptr. 61], the court held the defendant's right

against self-incrimination had not been violated by compelling him to submit to psychiatric evaluations for purposes of determining his competency to stand trial. The court applied the rule of use immunity to statements the defendant made to court-appointed psychiatrists, holding ". . . neither the statements of [defendant] to the psychiatrists appointed under section 1369 nor the fruits of such statements may be used in trial of the issue of [defendant's] guilt, under either the plea of not guilty or that of not guilty by reason of insanity." (*Id.* at p. 470; see also *People* v. *Arcega* (1982) 32 Cal.3d 504, 522 [186 Cal.Rptr. 94, 651 P.2d 338] [approving and adopting the holding in *Tarantino*].)

In *People* v. *Stanfill, supra,* 184 Cal.App.3d at page 581, the defendant argued his statements made to a psychiatrist during a mental competency examination conducted pursuant to section 1368 were absolutely privileged and therefore it was error to admit the psychiatrist's testimony at the guilt phase of his trial. The court disagreed, holding the privilege against self-incrimination is not absolute and can be waived. "A defendant who takes the stand to testify in his own behalf waives the privilege against self-incrimination to the extent of all inquiries which would be proper on cross- examination and is subject to impeachment the same as any other witness. [Citations.] Thus, the defendant waives the privilege with respect to any matter to which he testified expressly or impliedly on direct examination and that is relevant to impeach his credibility as a witness. [Citation.]" (*Ibid.*)[11]

 Similarly, if a defendant testifies at a suppression hearing in superior court or a suppression motion at a preliminary hearing, his testimony may not be used against him by the prosecution in its case-in-chief. (*People* v. *Drews* (1989) 208 Cal.App.3d 1317, 1325 [256 Cal.Rptr. 846], citing *Simmons* v. *United States* (1968) 390 U.S. 377 [19 L.Ed.2d 1247, 88 S.Ct. 967] and *People* v. *Cornejo* (1979) 92 Cal.App.3d 637 [155 Cal.Rptr. 238].) "However, if a defendant's testimony at a pretrial suppression hearing is inconsistent with his testimony at trial, the People may use such pretrial testimony for impeachment. [Citation.]" (*People* v. *Drews, supra,* 208 Cal.App.3d at p. 1325.) This rule does not force a defendant to choose between a valid Fourth Amendment claim and the Fifth Amendment right against self-incrimination. "He may testify *truthfully* at his suppression motion should he elect to do so. In the event that he chooses to testify

[11]In *People* v. *May* (1988) 44 Cal.3d 309, 319 [243 Cal.Rptr. 369, 748 P.2d 307], the court cited *Harris* v. *New York* (1971) 401 U.S. 222 [28 L.Ed.2d 1, 91 S.Ct. 643] and *People* v. *Stanfill, supra,* 184 Cal.App.3d at pages 581-582, for the proposition that ". . . the privilege against self-incrimination cannot be invoked by one who has voluntarily taken the witness stand to testify concerning the subject matter of his prior statement." (44 Cal.3d at p. 319.)

*truthfully* at trial, he runs no risk of being impeached. He has, however, no right to commit perjury and is not entitled to a 'false aura of veracity.' [Citation.] If his trial testimony is inconsistent with that previously given at the suppression hearing, he may be impeached therewith. (See Evid. Code, §§ 780, 1235.)" (*People* v. *Douglas* (1977) 66 Cal.App.3d 998, 1005-1006 [136 Cal.Rptr. 358], fn. omitted, original italics.)

Use immunity has also been applied in juvenile cases. For example, in *Bryan* v. *Superior Court* (1972) 7 Cal.3d 575, 587 [102 Cal.Rptr. 831, 498 P.2d 1079], the court held ". . . evidence of admissions made by a minor to the juvenile judge or the juvenile probation officer should be excluded in a criminal prosecution, for allowing this evidentiary use of the admissions would frustrate the protective and rehabilitative philosophy of the Juvenile Court Law and would deny to the minor the protection of exclusionary rules which apply to all persons charged with the commission of crimes in comparable circumstances." Similarly, in *In re Wayne H.*, *supra*, 24 Cal.3d at page 602, the court held statements made by a juvenile to a probation officer in an interview to determine whether the minor need be further detained pending a court hearing (Welf. & Inst. Code, § 628) are inadmissible as substantive evidence or for impeachment in any subsequent proceeding to determine criminal guilt, although they may be used at hearings on the issues of detention and fitness for juvenile treatment.[12]

In *Sheila O.* v. *Superior Court*, *supra*, 125 Cal.App.3d at page 814, the minor refused to testify at a fitness hearing (Welf. & Inst. Code, § 707) for fear her testimony could be used against her in a later trial. After the juvenile court determined the minor was not fit to be dealt with under the juvenile court law, the minor was arraigned in municipal court. She then sought a writ to compel the juvenile court to allow her to testify at a fitness hearing without risking use of the testimony in a later determination of guilt. The court issued the writ, holding ". . . candid testimony by the juvenile at the fitness hearing should be encouraged to aid in the determination of where best to try the minor; fairness to the minor requires that this testimony not be given at the expense of the privilege against self-incrimination." (125 Cal.App.3d at p. 816.) Citing *Coleman*, *Bryan* and *Wayne H.*, the court declared ". . . a rule of evidence that testimony given by the juvenile at the

---

[12]In *Wayne H.*, the minor's statement to his probation officer that he had committed the crime for which he was being detained was admitted into evidence at the jurisdictional hearing, over objection, as substantive evidence of the minor's guilt. (*In re Wayne H.*, *supra*, 24 Cal.3d at p. 598.) Thus, the issue of whether his statements to the probation officer could be used for impeachment was not squarely before the court.

fitness hearing is inadmissible at the jurisdictional hearing *except for the purpose of impeachment.*" (*Id.* at pp. 816-817, italics added.)[13]

■ From these cases, the following rule emerges: the privilege against self-incrimination is violated unless a minor is provided with use immunity for statements he or she makes to a probation officer or for testimony he or she gives at a juvenile court fitness hearing. The exception carved out of this rule is that the minor waives the privilege against self-incrimination by testifying at trial inconsistently with statements made in the context of a juvenile court proceeding to the extent those statements are proper impeachment evidence.

## C

■ Here, the court excluded any statements Humiston made to the probation officer and thus no issue of use immunity as to those statements is before us. Rather, we deal only with the statements Humiston made to her retained psychologists who testified on her behalf in an effort to show she was a fit and proper subject for juvenile court treatment under the criteria of Welfare and Institutions Code section 707, subdivision (c). In this regard, those statements are neither legislatively nor judicially compelled[14] and thus are more analogous to a minor's own testimony where he or she, with advice of counsel, exercises the right to be heard at a fitness hearing. Although Humiston's testimony in the form of statements voluntarily made to the psychologists could not later be used as substantive evidence of her guilt at trial, they were admissible to impeach her once she elected to testify inconsistently with those prior statements. (*Sheila O.* v. *Superior Court, supra,* 125 Cal.App.3d at pp. 816-817; *People* v. *Stanfill, supra,* 184 Cal.App.3d at p. 581.)

The statements in question were proper impeachment evidence. On direct examination, Humiston denied any involvement in Holloway's murder. She testified she had been afraid of Jurado throughout their entire relationship

---

[13]The court in *Ramona R.* v. *Superior Court, supra,* 37 Cal.3d at pages 806-807, held the exclusionary use immunities applied in prior juvenile court decisions survived the passage of Proposition 8 which added section 28, subdivision (d) to article I of the California Constitution. The court quoted language in *Sheila O.* in its discussion of the use immunity rule and in a footnote, stated it was not reaching "the question whether the testimony may be used for purposes of impeachment," thus neither approving nor disapproving dictum in *Sheila O.* on this point. (*Ramona R.* v. *Superior Court, supra,* 37 Cal.3d at p. 807, fn. 2.)

[14]In contrast, a probation officer is required to file a report on the minor's "behavioral patterns and social history" (Welf. & Inst. Code, § 707, subd. (a)) and thus a minor who refuses to speak to the probation officer prejudices his or her position by appearing uncooperative or preventing the probation officer from determining whether the minor can be rehabilitated. (*Ramona R.* v. *Superior Court, supra,* 37 Cal.3d at p. 810, fn. 3.)

and did what he told her to do the night of the murder cause she was afraid he was going to kill her.

In an attempt to impeach Humiston on cross-examination, the prosecutor asked her about certain statements she had made to her two retained psychologists during the juvenile court fitness proceedings concerning her involvement in Holloway's murder. Humiston testified she did not remember spending eight or nine hours with Dr. Menkowski and did not remember telling him she saw Jurado drag Holloway out of the car. She also did not remember Dr. Menkowski testifying at the juvenile court fitness hearing that he did not believe she participated in the offense because she was afraid of Jurado. Humiston denied telling Dr. Menkowski she was not afraid of Jurado during the offense or that she voluntarily held Holloway down.

Humiston further testified on cross-examination she did not remember being interviewed by Dr. DiFrancesca but probably told her she was attracted to Jurado because he was nice to her, was a character at a party and was fun. Humiston did not recall if she told Dr. DiFrancesca that the relationship with Jurado changed after a few months.

When weighing Humiston's credibility, the jury was entitled to consider that her trial testimony was inconsistent with prior statements she made to her retained psychologists. The prosecution's line of questioning was designed to test Humiston's truthfulness and elicited proper impeachment evidence. Under these circumstances, the court properly allowed use of Humiston's statements to her psychologists for this purpose.

### III

Humiston contends the court erred in admitting evidence of (1) her use of drugs since the age of 13, and (2) her use of the Penal Code section for murder as an identifying code to communicate with Jurado by pager at least eight months before the crime. She asserts the evidence was irrelevant, tended to prove only criminal disposition and thus was more prejudicial than probative.[15]

### A

Before trial, defense counsel asked the court to exclude evidence of Humiston's drug use. The court agreed this evidence would not be relevant to rebut evidence of her peaceful and nonviolent character, but deferred

---

[15]In Humiston's motion for new trial, she unsuccessfully claimed the erroneous admission of evidence of her drug use denied her a fair trial.

ruling on whether it was admissible as evidence of her participation in any conspiracy to kill Mynatt.

On direct examination, Humiston testified she became very upset when Johnsen told her that Holloway was selling drugs to Jurado. As a result of this information, Humiston and Holloway had an argument and Holloway threatened to beat up Humiston. Defense counsel later tried to clarify this testimony by asking Humiston whether she meant to say she never used any drugs or Jurado never gave her any drugs. Humiston answered "no" to both questions. Defense counsel then asked the court to restrict the prosecutor's cross-examination of Humiston as to her drug use, arguing that fact had been established and thus was irrelevant and also inadmissible under Evidence Code section 352. The court ruled Humiston had opened up the issue on direct examination and the prosecution could inquire into her drug use to impeach her credibility as well as to show motive. The court further ruled inquiry on that point would be limited and the court would weigh the probative value against its prejudicial effect under Evidence Code section 352 "if we reach that point."

On cross-examination, the following exchange occurred without objection:

"Q. Now, were there any other reasons you didn't like Terry Holloway?

"A. No.

"Q. Well, you testified this morning that she was giving drugs to [Jurado] and 'that bothered me'?

"A. That's what Brian Johnsen said that night.

"Q. Were you upset about that?

"A. A little bit, yeah. Yes.

"Q. Why?

"A. Because I wanted him to stop.

"Q. Well, you were using drugs from before the time you met Mr. Jurado, weren't you?

"A. Yes.

"Q. Going back to the time you were 13?

"A. Yes.

"Q. But [Holloway's] giving drugs to [Jurado] offended you to the point where you didn't like [Holloway]?

"A. Yes."

## B

Unless precluded by statute, any evidence is admissible to attack the credibility of a witness if it will establish a fact that has a tendency in reason to disprove the truthfulness of the witness's testimony. (Evid. Code, § 780; *People* v. *Jones* (1984) 155 Cal.App.3d 153, 182 [202 Cal.Rptr. 162].) ▪ Although evidence of crimes other than those for which the defendant is being tried is inadmissible to prove the defendant's criminal disposition (Evid. Code, § 1101, subd. (a)), such evidence is admissible to prove a material disputed issue such as motive or intent. (*People* v. *Douglas* (1990) 50 Cal.3d 468, 510 [268 Cal.Rptr. 126, 788 P.2d 640].)

▪ If a defendant takes the stand and generally denies the crime with which he is charged, the permissible scope of cross-examination is "very wide." (*People* v. *Lanphear* (1980) 26 Cal.3d 814, 833-834 [163 Cal.Rptr. 601, 608 P.2d 689].) When a defendant voluntarily testifies, the prosecutor "may fully amplify his testimony by inquiring into the facts and circumstances surrounding his assertions, or by introducing evidence through cross-examination which explains or refutes his statements or the inferences which may necessarily be drawn from them. [Citation.]" (*People* v. *Cooper* (1991) 53 Cal.3d 771, 822 [281 Cal.Rptr. 90, 809 P.2d 865].)

▪ Here, Humiston testified on direct examination that she had not meant to say she had never used drugs and that, in fact, Jurado had given her drugs. By indirectly admitting her drug use and thereby attempting to make it a nonissue, Humiston could not preclude the prosecution from inquiring into the facts and circumstances surrounding that admission. (See *People* v. *Gates* (1987) 43 Cal.3d 1168, 1185 [240 Cal.Rptr. 666, 743 P.2d 301].) The prosecutor's line of questioning was designed to show that Humiston's admitted dislike of Holloway was for reasons other than Holloway having supplied Jurado with drugs, since Humiston had been a drug user herself. In this regard, Humiston's drug history[16] became relevant both to show a possible motive for her involvement in Holloway's murder as well as to

---

[16]The fact the prosecutor elicited testimony that Humiston had been using drugs since age 13 is of little import here. We note there was no specific objection to the age when Humiston first used drugs and thus the court was not called upon to weigh the probative value of this

impeach her credibility. (See *People* v. *Cooper, supra,* 53 Cal.3d at p. 823; *People* v. *Hayes* (1990) 52 Cal.3d 577, 616-617 [276 Cal.Rptr. 874, 802 P.2d 376].) Contrary to Humiston's assertion, the purpose of this evidence was not solely to portray her in a negative light or to prove criminal disposition. The evidence was properly admitted.

## C

During the prosecutor's cross-examination of Shigemura, she testified Jurado used a beeper (pager) to communicate with Humiston from March or April 1990 until September 1990 when Jurado lost the beeper and no longer used it. The prosecutor asked Shigemura what beeper number Humiston used to communicate with Jurado. Defense counsel, knowing the code was 187, the Penal Code section for murder, objected on the ground the code number was irrelevant, more prejudicial than probative and improper character evidence.

The prosecutor argued the code 187 showed the nature of Humiston's relationship with Jurado. He further argued the code number was relevant because it showed Humiston was a different type of person than that portrayed by the defense and that it was inconsistent for her to claim being battered by Jurado yet have a ready means of getting Jurado's attention at any time. Defense counsel clarified he was not objecting to the existence of a code number, but only the number itself. The court overruled the objection. Shigemura then testified that when Humiston used the beeper to reach Jurado, she used the code 187 which Shigemura knew to be murder. She further testified she was told Humiston selected that particular code. On cross-examination, Humiston admitted she used a beeper to get in touch with Jurado but denied she used the code 187.

Under Evidence Code section 1101, subdivision (a), except as otherwise provided, evidence of specific instances of a person's conduct is inadmissible when offered to prove his or her conduct on a specified occasion. Such evidence is admissible, however, if relevant to prove some fact other than the defendant's disposition to commit a crime. (Evid. Code, § 1101, subd. (b).) ■ One of the purposes of this rule of exclusion is to guard against the probability that evidence having little bearing on the crime with which the defendant is charged will assume undue proportions and prejudice the defendant in the minds of the jurors. (See *People* v. *Haston* (1968) 69 Cal.2d 233, 244 [70 Cal.Rptr. 419, 444 P.2d 91].)

---

evidence against any prejudicial effect. In any event, once Humiston admitted on direct examination Jurado had given her drugs, the prosecutor was entitled to ask her whether she had been using drugs even before she met Jurado.

Because evidence of prior bad acts always involves the risk of prejudice regardless of its probative value, other restrictions apply to limit its admissibility. (*People* v. *Thompson* (1980) 27 Cal.3d 303, 318 [165 Cal.Rptr. 289, 611 P.2d 883].) Thus, under Evidence Code section 352, the probative value of this evidence must outweigh its prejudicial effect. (*Ibid.*)

■ Here, evidence Humiston used a beeper to communicate with Jurado may have been relevant to show they had a close relationship and Humiston was aware of his activities between March and September 1990, contrary to Humiston's claim she was afraid of Jurado throughout their entire relationship. The fact Humiston used her own code to identify herself added little to the probative value of this evidence and was of marginal relevance. However, evidence she used the Penal Code section for murder, eight months before the crime, was not relevant to prove any fact other than her disposition to commit murder. No evidence of any murder plan between March and September 1990 was presented. The coincidence of using the code for murder and later committing murder is precisely what makes the evidence so prejudicial in the eyes of the jury. Thus, evidence Humiston used the number 187 should have been excluded under Evidence Code section 352.

## D

■ Humiston asserts the court further erred in failing to instruct the jury under CALJIC No. 2.50 on the permissible use of this evidence. She argues this allowed the jury to use the evidence, as intended by the prosecution, on the question of Humiston's disposition to commit the crime. However, Humiston failed to request the instruction and thereby waived the right to raise it on appeal.

Where, as here, a defendant presents evidence of uncharged criminal acts, a limiting instruction is deemed waived unless requested. (*People* v. *Morrisson* (1979) 92 Cal.App.3d 787, 790-791 [155 Cal.Rptr. 152].) Further, the trial court is not required to instruct sua sponte on the limited admissibility of evidence of past criminal conduct or prior bad acts. (*People* v. *Collie* (1981) 30 Cal.3d 43, 63-64 [177 Cal.Rptr. 458, 634 P.2d 534, 23 A.L.R.4th 776]; *People* v. *Milner* (1988) 45 Cal.3d 227, 251-252 [246 Cal.Rptr. 713, 753 P.2d 669].)

## E

■ Although the court erred in admitting evidence that Humiston used the number 187 to communicate with Jurado by pager, the error does not require reversal. Introduction of evidence Humiston used the number 187

and Shigemura "was told" Humiston had chosen that number, later denied by Humiston, was somewhat isolated and there was no further use of it by the prosecution.[17] Moreover, the prosecution's case was strong. The evidence showed Humiston knew about the plan to kill Holloway before leaving Schmidt's apartment. Humiston, Jurado and Shigemura encouraged Holloway to get off the telephone and accompany them in Humiston's car. Once in the car, Jurado began to strangle Holloway while Humiston straddled and punched her and held her down. She said she did this because Holloway had been threatening her family and later said the murder was necessary because Holloway was a "snitch." Humiston helped clean blood off the car and dispose of other evidence. On this record, we conclude there is no reasonable probability Humiston would have received a verdict more favorable if the evidence of the beeper code number had been excluded. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

## IV-VIII*

. . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The court is directed to amend the abstract of judgment to reflect that imposition of Humiston's sentence was stayed on count 1, conspiracy, rather than on count 2, murder. In all other respects, the judgment is affirmed.

Todd, Acting P. J., and Benke, J., concurred.

Appellant's petition for review by the Supreme Court was denied March 3, 1994.

---

[17]Although the prosecutor did not talk about the beeper code number in his closing argument, defense counsel did mention it in his closing argument.

*See footnote, *ante*, page 460.