[Crim. No. 6446. Fourth Dist., Div. Two. Feb. 14, 1975.]

THE PEOPLE, Plaintiff and Respondent, v.
LAWRENCE EARL TANNER, Defendant and Appellant.

346

COUNSEL

.R. R. Campagna, under appointment by the Court of Appeal, and Ray L. Craig for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Daniel J. Kremer, Assistant Attorney General, Alan S. Meth, and Patricia D. Benke, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

TAMURA, J.—Following a jury trial defendant was convicted of conspiracy to sell amphetamines and possession of a firearm by a felon

and sentenced to state prison.[1] Defendant appeals from the judgment of conviction.

On or about June 29, 1973, Walker Levon Granger met Donald Lawrence Mansfield and Henry Washington Davis and told them he wanted to buy five kegs (a keg contains 50 jars of 1,000 pills each) of amphetamines. Unknown to Mansfield and Davis, Granger had been arrested two months earlier and was then cooperating with the police. Negotiations continued for several days, Mansfield stating he was in contact with a person named Larry who would supply the drugs. The price was set at $53 per jar, or a total of $13,250. Granger reported all of this to the police who instructed him on how to proceed.

Ultimately Granger and Mansfield agreed that the exchange would take place in a motel room. On July 2, 1973, at 11:30 p.m. Granger and Officer Gaunt, who had represented himself as Granger's partner, were waiting in the motel room and other officers were in an adjoining room when Mansfield and Davis arrived. The money to purchase the drugs, about $15,000, was counted and Mansfield went out to get the drugs, leaving Davis behind. Some time later Mansfield returned empty-handed, saying that Larry would not make the delivery until the next day.

On July 3d at 9:45 p.m. Granger and the officers were again waiting in the motel when two cars pulled up outside simultaneously. Defendant, Mansfield, and Davis were in one car, Kent Tuttle and Chester Wells in the other. Tuttle removed a suitcase from his car containing three and a half kegs of amphetamines and went with Mansfield into the motel where the pills were sold for $9,275. Meanwhile defendant moved to the front passenger seat in the car with Wells.

After leaving the motel room, Tuttle got into the back seat behind defendant and Wells while Mansfield got into the other car with Davis. At this point the officers came out with guns drawn and identified themselves. Defendant was seen to have a gun in his hand which he dropped when one of the officers fired into the vehicle's hood.

On Mansfield's person was found a slip containing figures apparently relating to the price of the pills. Under one column of figures was the

---

[1]Defendant was charged by an amended information with conspiring with others to sell amphetamines (count I), offering to sell amphetamines on or about July 3, 1973 (count II), offering to sell amphetamines on or about July 2, 1973 (count III), sale of amphetamines (count IV), and possession of a firearm by a felon (count V).

word "Larry," and under another the word "me." A small quantity of cocaine was found on Wells.

Defendant was tried alone.[2] At the trial Mansfield testified that defendant was the Larry referred to on the slip and in the conversations with Granger. Mansfield said he had asked defendant to obtain the drugs and defendant had agreed; it was defendant who contacted Tuttle and made the arrangements; and until he saw Tuttle at the motel Mansfield had not known Tuttle would be supplying the drugs. On cross-examination Mansfield admitted defendant had told him he "didn't want any part of the deal" meaning either he wasn't going to profit from it or he wouldn't be present when the sale was made. He also admitted defendant had never seen the slip of paper with the figures on it.

A different version was given by Tuttle, who testified that he negotiated the transaction with Mansfield and Davis in defendant's presence a few days before the day of the arrest. He said he was unsure about defendant's role in the transaction but if defendant had not been involved he would not have dealt with Mansfield because he didn't trust him as well as he had trusted defendant.

As part of its case in chief, the prosecution introduced two letters written by defendant while awaiting trial, one to Deputy District Attorney Kloepfer, who was then in charge of the case, and the other to the district attorney. The letters complained that Kloepfer was biased against defendant and had not offered him a fair plea bargain. In the letter to Kloepfer defendant wrote, "Maybe someone or some people have told you that I was the big man in that sales. In all honestity [sic] I am third man. . . ." In the second letter he wrote, "The D.A. has made bargins [sic] with the 3 most serious [sic] involved people in our case. The other two of us have less guilt in the case, are held to answer . . . [¶] I don't claim to be completely innocent. . . ."

Defense counsel strenuously objected to the introduction of these letters in evidence and after they were read to the jury he moved for a mistrial.

Defendant took the stand in his own behalf, denied any involvement in the drug transaction and claimed that the gun belonged to Wells and that he did not pick it up at the time the arrest was made. He admitted

---

[2]Mansfield had earlier pleaded guilty to sale of amphetamines, Tuttle to possession of amphetamines for sale, and Wells to possession of cocaine. Davis, the last to enter a guilty plea, absconded and was still at large at the time of defendant's trial.

that Mansfield had asked him to obtain amphetamines but claimed he had refused. He also admitted hearing Mansfield and Tuttle discussing the transaction at his house but said he was not aware that a drug sale was to take place on the evening of July 3d and had gone along because he had been offered some cocaine. He said that the references in his letters to his guilt meant his guilt in agreeing to use cocaine.

Defendant's primary contention on appeal is that his letters were part of the plea bargaining process and therefore inadmissible under Evidence Code section 1153[3] and Penal Code section 1192.4[4] as construed in *People* v. *Wilson,* 60 Cal.2d 139 [32 Cal.Rptr. 44, 383 P.2d 452], and *People* v. *Sirhan,* 7 Cal.3d 710 [102 Cal.Rptr. 385, 497 P.2d 1121] [cert.den., 410 U.S. 947 (35 L.Ed.2d 613, 93 S.Ct. 1382)].

*Wilson* involved a prosecution for first degree murder. Defendant's attorney had prepared an affidavit containing an offer to plead guilty to second degree murder, addressed to the trial court and signed by defendant. The district attorney, who apparently was not interested in a negotiated plea, introduced the affidavit into evidence at the subsequent trial and commented upon it in his argument to the jury.

The court held this was error in light of Penal Code section 1192.4. "By enacting this section the Legislature has decided, just as it did many years ago in civil cases by prohibiting the introduction into evidence of offers to compromise (Code Civ. Proc., § 2078), that it is in the public interest that rejected pleas of guilty to a lesser degree of crime shall not be admissible in evidence. The obvious purpose of the section is to promote the public interest by encouraging the settlement of criminal cases without the necessity of a trial. [¶] That policy is equally applicable to the situation now before us, where the issue is the admissibility of a rejected *offer* to plead guilty to a lesser degree of crime. If it is in the public interest to deny admissibility to a plea of guilty to a lesser degree that was formally entered but is 'deemed withdrawn' because it was 'not accepted by the prosecuting attorney' (Pen. Code, § 1192.4), it is equally

---

[3]Evidence Code section 1153 provides: "Evidence of a plea of guilty, later withdrawn, or of an offer to plead guilty to the crime charged or to any other crime, made by the defendant in a criminal action is inadmissible in any action or in any proceeding of any nature, including proceedings before agencies, commissions, boards, and tribunals."

[4]Penal Code section 1192.4 provides: "If the defendant's plea of guilty pursuant to Section 1192.1 or 1192.2 is not accepted by the prosecuting attorney and approved by the court, the plea shall be deemed withdrawn and the defendant may then enter such plea or pleas as would otherwise have been available. The plea so withdrawn may not be received in evidence in any criminal, civil, or special action or proceeding of any nature, including proceedings before agencies, commissions, boards, and tribunals."

in the public interest to deny admissibility to evidence of an offer to plead guilty to the same lesser degree that was 'not accepted by the prosecuting attorney.' The earlier cases holding such offers to be admissible are therefore no longer controlling." (*People* v. *Wilson, supra,* 60 Cal.2d 139, 156.)

The Attorney General argues that the *Wilson* rule should be limited to offers to plead guilty. According to this interpretation any incidental statements made in the course of plea negotiations, particularly admissions of guilt, would be admissible. The Attorney General cites no authority for his position. The question whether admissions made by a defendant in the context of a bona fide offer to plead guilty come within the policy of Evidence Code section 1153 and Penal Code section 1192.4 was specifically left open in *People* v. *Sirhan, supra,* 7 Cal.3d 710, 746, fn. 24, and has apparently not been decided since.[5] Given the situation presented in the case at bench, resolution of this question becomes unavoidable.

As noted in the quotation from *Wilson,* exclusion of offers to plead guilty serves the same purpose as exclusion of settlement offers in civil cases—reducing the public burden of conducting trials. It is therefore significant that in civil cases the exclusion, now found in Evidence Code section 1152,[6] explicitly covers "any conduct or statements made in negotiation" of settlement, as well as the offer to settle itself. As the comment to that section says: "The rule excluding offers is based upon the public policy in favor of the settlement of disputes without litigation.

---

[5]In *People* v. *Sirhan, supra,* 7 Cal.3d 710, during proceedings outside the presence of the jury defendant, in an angry outburst, said he wanted to plead guilty to first degree murder because he killed Robert Kennedy with wilful and deliberate premeditation. During cross-examination of defendant the prosecution elicited from defendant a concession that he had made the statement. The reviewing court held that the statement was admissible because it was not made during a bona fide offer to plead guilty and in footnote 24 at page 746 said: "It is thus unnecessary to consider whether admissions made by a defendant in the context of a bona fide offer to plead guilty come within the exclusionary rule of Evidence Code section 1153 and Penal Code section 1192.4."

[6]Evidence Code section 1152 provides: "(a) Evidence that a person has, in compromise or from humanitarian motives, furnished or offered or promised to furnish money or any other thing. act, or service to another who has sustained or will sustain or claims that he has sustained or will sustain loss or damage, as well as any conduct or statements made in negotiation thereof, is inadmissible to prove his liability for the loss or damage or any part of it.

"(b) This section does not affect the admissibility of evidence of:

"(1) Partial satisfaction of an asserted claim or demand without questioning its validity when such evidence is offered to prove the validity of the claim; or

"(2) A debtor's payment or promise to pay all or a part of his preexisting debt when such evidence is offered to prove the creation of a new duty on his part or a revival of his preexisting duty."

The same public policy requires that admissions made during settlement negotiations also be excluded." (See also, *County of San Joaquin* v. *Galletti,* 252 Cal.App.2d 840, 842-843 [61 Cal.Rptr. 62].) The contrary rule, which existed in California until 1965 and still prevails in most sister states, is based on a conflicting interpretation of the purpose of excluding settlement offers, i.e., that the probative value of the offer is outweighed by its prejudicial effect. (See 4 Wigmore on Evidence, p. 39, fn. 5.)

Recent decisions of our high court have held admissions of criminal conduct inadmissible in several situations where necessary to the proper functioning of the penal and criminal justice systems. Public policy has been held to require exclusion of admissions to a probation officer (*People* v. *Harrington,* 2 Cal.3d 991, 999 [88 Cal.Rptr. 161, 471 P.2d 961] [cert. den., 402 U.S. 923 (28 L.Ed.2d 662, 91 S.Ct. 1384)], admissions to a trial judge at the direction or suggestion of a probation officer (*People* v. *Hicks,* 4 Cal.3d 757, 762 [94 Cal.Rptr. 393, 484 P.2d 65]), and admissions by a minor in connection with juvenile court proceedings (*Bryan* v. *Superior Court,* 7 Cal.3d 575, 588-589 [102 Cal.Rptr. 831, 498 P.2d 1079] [cert. den., 410 U.S. 944 (35 L.Ed.2d 610, 93 S.Ct. 1380)]).

Exclusion of admissions made in the course of plea negotiations is equally important to the proper functioning of the criminal justice system. In deciding whether a settlement in a criminal case is in the public interest, a district attorney must be greatly influenced by his assessment of the defendant's culpability. Indeed, one of the advantages of plea bargaining is that it allows a fine adjustment of the criminal charge to the facts of the particular offense. (See *People* v. *West,* 3 Cal.3d 595, 605 [91 Cal.Rptr. 385, 477 P.2d 409].) Accordingly, if we wish to encourage negotiated pleas, defendant's actual guilt should not be a forbidden topic of discussion. That exclusion of admissions will promote this form of candor and thus facilitate settlements seems beyond dispute.[7] Failure to exclude such admissions would not only hamper efforts to reach an agreement but also, by discouraging plain speaking, would perpetuate the deviousness in the plea negotiation procedure so much condemned by our Supreme Court. (*People* v. *West, supra,* 3 Cal.3d 595, 609.)

██ In order to effectuate the purpose of Evidence Code section 1153

---

[7]We are conscious of the incongruity in the statement that it is natural and desirable for a criminal defendant to discuss his guilt frankly with his prosecutor. This incongruity is attributable to our plea bargaining system which requires the district attorney to assume functions not fully compatible with his traditional role as advocate.

and Penal Code section 1192.4 as interpreted by our high court, we construe those sections to include admissions made in the course of bona fide plea bargaining negotiations.

While our decision is founded upon the public interest in encouraging negotiated settlements in criminal cases, fairness to defendants requires the same result. With judicial approval, plea bargaining has become an integral part of our criminal justice system. (*People* v. *West, supra,* 3 Cal.3d 595, 604.) Plea bargains can be so frequently made because both sides benefit. Thus the system constitutes a standing invitation to talk, to explain, to bargain, and to admit. If admissions to a probation officer are involuntary when the defendant is warned that failure to cooperate may result in a harsher sentence (see *People* v. *Quinn,* 61 Cal.2d 551, 554 [39 Cal.Rptr. 393, 393 P.2d 705]), then admissions to a district attorney who has indicated a willingness to consider reducing the charge also raise a substantial voluntariness question.

Although most defendants understand what plea bargaining is and how it works, the Attorney General's proffered distinction between an offer to plead guilty and an admission of guilt is not one that those untrained in the law should be expected to make spontaneously or to appreciate the reasons for making. In short, such a distinction would be a trap for the unsophisticated, which we decline to read into the law.

■ The Attorney General next argues that defendant's letters were not part of bona fide plea negotiations. The contention is devoid of merit.

The record contains ample evidence that bona fide plea bargaining was being conducted when defendant wrote the letters. In the first letter defendant writes: ". . . I am unhappy with the deal offered me." This reference was explained by defendant during the course of his testimony.

"By Mr. Parker [Deputy District Attorney]:

"Q. And isn't it true that Mr. Kloepfer offered to let you plead guilty to one count of selling?

". . . . . . . . . . . . . . . . .

"The Witness [Defendant]: Yes, he offered me to plead guilty to sales, and I wasn't guilty of sales so I didn't take the plea bargain."

During a hearing held in chambers to determine the admissibility of the letters, defense counsel said: ". . . I was in the process of plea bargaining and negotiating with Mr. Kloepfer for some type of a—a reduced plea other than the present charges. . . . As a result of my negotiations or during the course of my negotiations with Mr. Kloepfer and as a result of my client's conversation with his Probation Officer, my client wrote these letters, . . ." To show that negotiations continued after the letters were sent, defense counsel produced a communication he had received from Mr. Kloepfer in which Kloepfer mentioned defendant's letters and then commented: " 'I would think it would be in his interest to resolve the case sooner than November 9th, 1973.' "

In the letters themselves, defendant indicates his willingness to accept a deal if offered one he considers fair. In the first letter he writes: "In court they [other defendants in the case] have made deals with you and are happy because they realize their guilt. I realize my guilt too. And that is why I am unhappy with the deal offered me. . . . [¶] Please try to treat me as fair as you have the other people. . . ." The second letter is similar: "If you would have time to check into the case and let me know if you think, I am being railroaded. [¶] I don't claim to be completly [sic] innocent. I just want a fair chance to strighten [sic] out my life." The remainder of the letters contain nothing to dispel the impression that they were primarily intended to influence the district attorney's office to reconsider its plea bargaining position and it is hard to imagine what other purpose defendant could have had. Since the record establishes that defendant's letters were part of ongoing plea negotiations, it was error to admit them as evidence against him.

The error in admitting these letters was seriously prejudicial to defendant and requires reversal. In reaching this conclusion, we are persuaded by the following considerations.

After Deputy District Attorney Kloepfer read the letters to the jury, the defense was not allowed to cross-examine Mr. Kloepfer to show the context in which the letters were written or to have him explain the workings of plea bargaining.[8] By cutting off these lines of inquiry, the trial court compounded its error in admitting the letters.

---

[8] The following exchanges took place during defense cross-examination of Deputy District Attorney Kloepfer after he had read defendant's letters to the jury:

"Q. [BY DEFENSE COUNSEL]: And isn't it true that in this case you and I attempted on many occasions to reach an out-of-court settlement?

"MR. PARKER [DEPUTY DISTRICT ATTORNEY]: Your Honor, I'm going to object. . .

Leaving aside the letters, the evidence against defendant was far from overwhelming.[9] The only witnesses with personal knowledge of defendant's innocence or guilt on the conspiracy charge, Mansfield and Tuttle, had a motive to incriminate defendant in order to please law enforcement officials who in turn would recommend lighter sentences. In addition, both were impeached by the demonstrated inconsistencies in the several versions they gave of the events in question. Furthermore, both gave testimony in some ways favorable to defendant. They testified that defendant said he "wanted no part of the deal" and never saw the amphetamines. If the letters had been excluded, there is a reasonable likelihood that the jury would have brought in a different verdict. (*People* v. *Collins,* 68 Cal.2d 319, 332 [66 Cal.Rptr. 497, 438 P.2d 33, 36 A.L.R.3d 1176].)

Since the erroneous admission of the letters compels reversal, it is unnecessary to discuss defendant's remaining contentions.

Judgment is reversed.

Gardner, P. J., and Kerrigan, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied May 1, 1975.

---

"THE COURT: Yes, I think so. I'll sustain the objection.

". . . . . . . . . . . . .

"Q. [BY DEFENSE COUNSEL]: . . . these negotiations take place in many instances regardless of the guilt or innocence of the client; isn't that true?

"MR. PARKER [DEPUTY DISTRICT ATTORNEY]: Well, your Honor, I'm going to object to that. . . .

"THE COURT: I'll sustain the objection.

". . . . . . . . . . . . .

"Q. [BY DEFENSE COUNSEL]: All right. At any rate, you and I were unable to reach any agreement in this case; isn't that correct?

"MR. PARKER [DEPUTY DISTRICT ATTORNEY]: Your Honor, again I object.

"THE WITNESS: No, that's not correct. We reached an agreement at one time.

"THE COURT: Wait a minute. There is an objection pending. Can't go into negotiations. It's not proper.

"MR. BORGES [DEFENSE COUNSEL]: Well, that's the point of my objection to these letters, your Honor.

"THE COURT: All right. I'll sustain the objection."

[9]The jury deliberated for over a day before reaching its verdict. It acquitted defendant of two counts of offering to sell amphetamines and one count of sale of amphetamines.