Filed 3/2/16  P. v. Esparza CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>OSCAR CEBALLOS ESPARZA,<br><br>    Defendant and Appellant. | B259578<br>(Los Angeles County<br>Super. Ct. No.  NA092367) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Gary J. Ferrari, Judge.  Affirmed as modified.

Mark Yanis, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Paul M. Roadarmel, Jr. and Stacy S. Schwartz, Deputy Attorneys General, for Plaintiff and Respondent.

Appellant Oscar Ceballos Esparza was convicted of first degree murder for hire and sentenced to life without the possibility of parole, plus 25 years to life for a weapons enhancement. On appeal, he contends the trial court committed reversible error by admitting portions of an audiotaped jailhouse conversation between appellant and his girlfriend in which they discussed the possibility of a plea deal. Acknowledging that trial counsel not only failed to object to the introduction of the pertinent portions of the audiotape, but opposed the prosecutor's request that they be redacted, appellant contends their admission rendered his trial fundamentally unfair, and asks us to address the issue of admissibility without regard to trial counsel's actions. In the alternative, he seeks a finding of ineffective assistance of counsel. Appellant also contends the trial court erred in imposing a parole revocation fine. Respondent agrees the parole revocation fine should be stricken.

Finding no error in the admission of the audiotaped conversation and no evidence of ineffective assistance of counsel, we affirm, but strike the parole revocation fine.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *Information*

Appellant was charged by information with murder. (Pen. Code, § 187, subd, (a).)[1] It was further alleged that appellant personally and intentionally discharged a handgun within the meaning of section 12022.53, subdivision (b) through (d), and that he committed the murder by means of lying in wait within the meaning of section 190.2, subdivision (a)(15) and for financial gain within the meaning of section 190.2, subdivision (a)(1).

---

[1] Undesignated statutory references are to the Penal Code.

2

B.  *Evidence at Trial*[2]

  1.  *Witness Testimony*

Jose Perez was one of the plaintiffs in a lawsuit against his former employer, the Van Elk Company.  Emil Vassilev was the owner of the Van Elk Company.  In the early morning hours of November 9, 2004, Perez was shot and killed while sitting in his car, having just arrived at his workplace -- B.F. Steel in Harbor City.

The chief prosecution witness was Lucio Pelayo who, along with his brother-in-law Horacio Camberos, had worked for the Van Elk Company.  Pelayo testified that he was approached by Camberos and told "Emil want[ed] [Perez and the other plaintiffs] dead."  Pelayo solicited appellant, who lived near him, to commit the murders.  The two met with Camberos to discuss payment, agreeing on $100,000.  Camberos gave Pelayo several addresses where Perez might be found and a description of Perez's car, and also accompanied Pelayo and appellant to a courthouse to identify Perez for them.

On the day of the shooting, Pelayo picked up appellant and drove him to Perez's workplace.  Pelayo was driving a green SUV; appellant was wearing a sweater with a hood and carrying a gun.  When they arrived at their destination, near B.F. Steel, appellant got out and stood behind the SUV for a brief period.  He got back in and instructed Pelayo to follow a passing car.  Pelayo drove a short distance and parked again.  Appellant took his gun and got out.  Pelayo heard multiple gunshots.  Appellant ran back to the car and instructed Pelayo to drive away.  Appellant told Pelayo "the job was done" and instructed him to call Camberos to get the money.  Later that day, Camberos met Pelayo and gave him $100,000 in cash, which Pelayo and appellant split.

---

[2]     All the evidence at trial was presented by the prosecution.  The defense did not put on a case.

Claudia Vargas, appellant's ex-girlfriend, recalled seeing appellant with a shoebox containing a large amount of money sometime in 2004. Appellant said he got the money for doing "'some shit'" with the "'guy down the street.'" In 2004, appellant bought a truck, an off-road vehicle and a motorcycle.

Prosecution witness Michael Tracey described seeing a greenish blue SUV with distinctive rims parked near B.F. Steel at approximately 5:00 a.m. on November 9. There was a man wearing a "hoodie" standing behind it. The man got into the passenger seat, and Tracey observed the car drive around a nearby building. He then heard multiple gunshots. Tracey walked toward B.F. Steel and saw Perez in his car, shot and bleeding to death.[3]

2. *Appellant's Interviews with Investigators*

After his arrest in 2009, appellant was interviewed by detectives on two occasions, days apart. The interview tapes were played to the jury. At the first interview, appellant denied ever being in Harbor City and initially denied knowing Pelayo or Camberos. Appellant eventually admitted knowing Pelayo and Camberos, but continued to deny any involvement in the shooting. At his second interview, appellant admitted going to the courthouse to see the faces of the men suing the Van Elk Company and going to Perez's workplace with Pelayo the day Perez was shot, but claimed to have accompanied Pelayo under the impression they were going to "check it out," and said that Pelayo surprised him by shooting Perez. Appellant denied receiving any money after the shooting.

---

[3] Tracey identified Pelayo's SUV from a photograph shown him in court, but was unable to identify the hoodie-wearing man or the driver.

3. *Appellant's Jailhouse Conversation*

The prosecutor played an audiotape of a phone conversation between appellant and his girlfriend, Vanessa Campos, that took place after appellant's incarceration. The two talked about their children and other family members prior to Campos's asking appellant what was going to happen with his case. The following conversation took place: Appellant: "I'ma get life." Campos: "That's the deal they gonna give you?" Appellant: "Twenty five to life, that's the deal. That ain't no fucking deal." Campos: "Well at least after twenty five years you could try to go out." Appellant: "Huh?" Campos: "Um, after twenty five years you could go out for--." Appellant: "That's if you -- with parole, no?" Campos: [Unintelligible.] Appellant: "Twenty five to life with parole. Huh?" Campos: "So you mean no parole?" Appellant: "Possibility -- I don't think so. I think it's just twenty five to life. What I'm gonna ask is if they can give me the possibility of parole, so after twenty five years I can go home."

The couple talked about their children and appellant spoke with their youngest child. Campos then asked: "[W]hy don't you just take the deal then, next week?" Appellant responded: "Cause they -- first they gotta drop the death penalty." A few minutes later, appellant reiterated: "I can't take any time. First they gotta drop the death penalty. If I fucking want a speedy trial or whatever, it leads to fucking prison. I mean to the death penalty. So first I gotta see if they gonna seek the death penalty on me or not." Campos asked: "What did everybody else get?" Appellant responded: "Twenty five to life." Campos asked: "Well, why they giving you more? What are they saying, you're the -- you are the um, gunman or something?" Appellant responded: "Yeah-- ..[¶] . . . [¶] Cause I didn't rat [th]em out. [¶] . . . [¶] And the rest of them testified against me. [¶] . . . [¶].So, now I'm the one. [¶] . . . [¶] I'm the one -- I'm the one doing twenty -- the death penalty." Campos asked how he felt about that. Appellant responded: "How can I

feel about it. Everybody fucking ratted on me." In the remainder of their conversation, they discussed Campos's church attendance and the care of appellant's children.

C. *Verdict and Sentencing*

The jury found appellant guilty and found the special allegations true. The court sentenced appellant to life in prison without the possibility of parole, plus 25 years to life for the use of a handgun. The court imposed a number of fines and assessments, including a $10,0000 parole revocation fine.

**DISCUSSION**

A. *Admissibility of the Discussions of a Possible Plea Deal*

1. *Background*

When the prosecutor offered into evidence the audiotape of the telephone conversation between appellant and Vanessa Campos, she requested that it be significantly redacted. She pointed out that appellant and Campos had talked about a number of superfluous things, and stated she wished to play only the portion where appellant referred to the sentences received by Pelayo and Camberos and to their having "'testified against [him]'" and "'ratted [him] out.'" Defense counsel objected to admission of any part of the audiotape, contending that none of the conversation was sufficiently relevant under Evidence Code section 352, and that the jury would "take these statements in a way in which they weren't intended." Counsel observed that appellant "makes similar statements in other parts of this transcript that the People don't wish to play." The court stated that it was the defense's option "to have part or all of [the audiotape]" played if the court ruled in

6

favor of playing the portion requested by the prosecutor.[4]  Defense counsel responded:  "[I]f the court is going to rule that it's going to be played, yes, I would request that the whole thing be played," and again objected to "anything being played."  The court ruled that the audiotape would be played in its entirety.

Prior to introducing the audiotape into evidence the following day, the prosecutor reiterated that she did not believe the entire audiotape should be played, and that she would prefer to play a redacted version that did not include discussions about "children, family, other relatives, the weather, . . . things of that nature" that were not "relevant to the case" and did not assist with understanding the portion of the conversation pertinent to the prosecution.  With respect to the references to a deal, she noted, "[T]ruth be told there was never any deal offered to this defendant at all. [¶] . . . [¶] So why it is that he's talking about a deal is clearly not pertinent information because there was in fact never any deal on the table."  The reference would "just confuse the issues because [appellant] is completely incorrect.  Either he's lying or misunderstanding everything that's gone on in this case."  Defense counsel again objected to playing a redacted version:  "[T]here are sections that deal with specific things that the People intend to play that aren't in those excerpts . . . .  They talk about the deal that he's going to get . . . .  [T]hey talk about his case throughout. . . .  [T]he context is important as well [as] about the way they are talking and it's not that long a tape."  The court re-stated its ruling that the audiotape would be played in its entirety.

---

[4]     See Evidence Code, § 356 ["Where part of [a] . . . conversation . . . is given in evidence by one party, the whole of the same subject may be inquired into by an adverse party . . . and when a . . . conversation . . . is given in evidence, any other . . . conversation . . . which is necessary to make it understood may also be given in evidence."]; *People v. Harris* (2005) 37 Cal.4th 310, 335 [jury is entitled to know context in which statements were made].

Appellant contends that notwithstanding his trial counsel's insistence that the entire tape be played, his conviction should be reversed because his reference to a "deal" was "highly prejudicial" and should have been excluded. He further contends that trial counsel's actions demonstrated ineffective assistance. Although defense counsel invited any error by insisting the entire audiotape be played, thereby relinquishing appellant's right to appeal this issue (see *People v. Harrison* (2005) 35 Cal.4th 208, 235-238), we address the merits. We conclude that the portions to which appellant now objects were not rendered inadmissible by California law or fundamental fairness, and that counsel likely had strategic reasons for asking that the entire tape be admitted.

2. *Analysis*

As explained in *People v. Wilson* (1963) 60 Cal.2d 139, 155, in the absence of statute, a criminal defendant's offer to plead guilty would be admissible at trial as probative evidence of guilt. California statutes have, however, long precluded the admission of such evidence. Evidence Code section 1153, enacted in 1965, precludes the admission in any action of "evidence of a plea of guilty, later withdrawn, or of an offer to plead guilty to the crime charged or to any other crime, made by the defendant in a criminal action . . . ." Section 1192.4, enacted a decade earlier, similarly provides: "If the defendant's plea of guilty . . . is not accepted by the prosecuting attorney and approved by the court, the plea shall be deemed withdrawn and the defendant may then enter such plea or pleas as would otherwise have been available. The plea so withdrawn may not be received in evidence in any criminal, civil, or special action or proceeding of any nature . . . ."

By enacting these provisions, the Legislature expressed its determination that excluding rejected guilty pleas or offers to plea from evidence "promote[s] the public interest by encouraging the settlement of criminal cases without the

8

necessity of a trial." (*People v. Sirhan* (1972) 7 Cal.3d 710, 745, overruled on another point in *Hawkins v. Superior Court* (1978) 22 Cal.3d 584; *People v. Wilson*, *supra*, 60 Cal.2d at p. 156.) The exclusion applies not only to pleas and offers to plead, but to "admissions made in the course of plea negotiations," as exclusion of such evidence "is equally important to the proper functioning of the criminal justice system," and "[f]ailure to exclude such admissions would not only hamper efforts to reach an agreement but also, by discouraging plain speaking, would perpetuate the deviousness in the plea negotiation procedure . . . ." (*People v. Tanner* (1975) 45 Cal.App.3d 345, 351.) The statutory exclusion does not, however, apply to statements made outside the context of "bona fide plea negotiations." (*People v. Magana* (1993) 17 Cal.App.4th 1371, 1376 (*Magana*).) "Bona fide plea negotiations include statements made to the trial court and to the prosecuting attorney because those are the participants in a plea bargain. [Citation.] On the other hand, bona fide plea negotiations do not include statements to transporting police officers [see *People v. Posten* (1980) 108 Cal.App.3d 633, 648] or statements made in anger to the trial court [see *People v. Sirhan*, *supra*, 7 Cal.3d at pp. 745-746]." (*Magana*, *supra*, 17 Cal.App.4th at p. 1377.)

By the same token, a defendant's reference to a possible deal, communicated to a third party who has no connection to the plea process, including "statement[s] contained in a letter to a fellow gang member, that he would accept a good deal if it were offered [to him]" cannot be construed as taking place in the context of "a bona fide plea negotiation." (*Magana*, *supra*, 17 Cal.App.4th at p. 1377.) As this court explained in *Magana*: "The prohibition . . . on the use of offers to plead guilty and statements made attendant thereto helps to implement the sound public policy of encouraging settlement of criminal cases by encouraging candor in plea negotiations. [Citation.] The accused and defense counsel are assured that

9

anything said will not be used against them if the negotiations are unsuccessful. However, there is no need to protect the defendant's voluntary disclosures about the bargaining process made to third persons uninvolved and unnecessary to the plea negotiations." (*Ibid*.) As we observed in *Magana*, the defendant's claim that his statements should have been excluded was further undermined by the fact that he was not involved in actual plea negotiations when he told his compatriot he would be willing to accept a deal, and his comments in the letter did not refer to an offer he had made, was considering making, or had received from the prosecutor. (*Ibid*.)

Here, the record is similarly devoid of evidence that appellant was involved in any actual plea negotiations with the prosecutor or had any realistic expectation of being offered a plea deal. Appellant's mention of a nonexistent deal to his girlfriend did nothing to advance the legislative goals of promoting settlement of criminal cases or encouraging candor during plea negotiations. Under the principles set forth in the authorities cited above, the evidence was not rendered inadmissible by the statutory exclusions.

Appellant professes to disavow reliance on these statutory provisions, contending the evidence was unduly prejudicial and should have been excluded under Evidence Code section 352, which gives the trial court discretion to exclude evidence if its probative value is "substantially outweighed" by the probability that admitting it will unduly prolong the proceeding, prejudice the opposing party, confuse the issue or mislead the jury. "To preserve a claim that a trial court abused its discretion in not excluding evidence under Evidence Code section 352, 'a party must make a timely and specific objection when the evidence is offered.'" (*People v. Harrison, supra,* 35 Cal.4th at p. 230.) Appellant's counsel objected to the limited portion of the audiotape the prosecutor wished to play to the jury on Evidence Code section 352 grounds; he did not object to introduction of the

10

portions referencing a "deal."[5] To the contrary, he insisted that the entire tape be played, pointing out that it was "not that long a tape," and suggesting that the portions of the audiotape the prosecutor wish to redact were "important" to the defense and necessary for "context." "[W]e cannot hold the trial court abused its discretion [under Evidence Code section 352] in rejecting a claim that was never made." (*People v. Valdez* (2004) 32 Cal.4th 73, 109.)

Appellant cites a number of non-California authorities, contending that the introduction of any evidence that a defendant is contemplating a plea bargain represents a fundamental flaw in the trial proceedings, violative of "federal due process rights," and must be addressed on appeal notwithstanding trial counsel's failure to object. The cases cited are not on point. In *U.S. v. Galindo* (9th Cir. 1990) 913 F.2d 777 (*Galindo*) and *Blue v. State* (Tex. Crim. App. 2000) 41 S.W.3d 129 (*Blue*), jurors were improperly advised of abandoned plea negotiations by the trial judges, who brought up the topic to explain delays occurring during the course of the trials. The appellate courts found the judges' references to inadmissible plea negotiations represented "fundamental error" requiring consideration of the issue on appeal despite the failure to object at trial (*Blue, supra,* 41 S.W.3d. at p. 131), and error of "constitutional dimension," entitling the defendants to a new trial "unless the government can prove that no reasonable possibility exists that the court's statement contributed to the jury's verdict." (*Galindo*, *supra*, 913 F.2d at p. 779.) Here, there were no bona fide plea negotiations with appellant requiring

---

[5] The portion of the audiotape the prosecutor wished the jury to hear -- appellant's statements that Pelayo and Camberos "testified against [him]" and "ratted on [him]," and that he was facing a lengthier sentence or the death penalty because he "didn't rat them out" -- were probative of guilt because the words appellant used indicated he had been involved in criminal activity with those men, as opposed to having been wrongfully accused. The trial court did not abuse its discretion in rejecting defense counsel's Evidence Code section 352 objection.

the exclusion of the evidence. Moreover, appellant's statements to Campos were not brought to the jury's attention through judicial comments which might inadvertently have conveyed the impression the judge thought the defendant was guilty and should have accepted a plea.[6]

Appellant also cites *State v. Abel* (1928) 320 Mo. 445 [8 S.W.2d 55] and *People v. Friedman* (1980) 79 Ill.2d 341 [403 N.E.2d 229], in which convictions were reversed because the trial courts permitted prosecution investigators to testify that the defendants asked them to convey offers to plead guilty to the prosecutors, and *State v. Simonson* (Idaho App. 1987) 732 P.2d 689, where the conviction was reversed because a witness accidentally referred to a guilty plea the defendant had withdrawn prior to trial. These decisions involved actual guilty pleas or bona fide plea negotiations. They do not address the issue presented here and in *Magana*, viz., whether discussions of possible plea deals with friends, family and other third parties who have no connection with the process must be excluded.

Finally, appellant cites *State v. McCrory* (2004) 104 Hawai'i 203 [87 P.3d 275], which involved the admission of testimony over defense objection that the defendant told a cellmate he "'hope[d] that he could get the charges [against him] reduced to manslaughter.'" (*Id*. at **277.) The prosecutor argued that the defendant's "'focus [on getting] . . . a reduced offense rather than an acquittal'" was indicative of "'consciousness of guilt.'" (*Id*. at **281.) The Hawai'i Supreme Court found the introduction of the cellmate's testimony did not violate Hawai'i's

---

[6] In *Galindo*, the Ninth Circuit affirmed the conviction, finding the error harmless in large part because the court realized its misstep and advised the jurors to "'not draw any inference of any kind for or against either side because there was some bargaining.'" (*Galindo*, *supra*, 913 F.2d at pp. 778, 779-780.) In *Blue*, the Texas court reached a contrary conclusion because the judge suggested "that he would have preferred that the defendant plead guilty," creating a presumption that "the judge kn[ew] something about the guilt of the defendant that the juror[s] d[id] not," thus "taint[ing appellant's] presumption of innocence." (*Blue*, *supra*, 41 S.W.3d at p. 132.)

version of Evidence Code section 1153, but held the testimony should have been excluded as unduly prejudicial, with minimal probative value, as the defendant's statement was vague and he may expressed the desire to have the charges reduced "for any number of reasons other than a 'consciousness of guilt.'" (87 P.3d 275, at **281.) Here, defense counsel failed to preserve any objection by insisting the entire audiotape be played. The prosecutor did not seek to use the statements as substantive evidence of appellant's guilt; indeed she did not refer to them at all in her arguments to the jury. In view of the other compelling evidence of appellant's guilt and the absence of any argument that appellant's passing reference to a "deal" was probative of guilt, we can find no basis to conclude that the evidence influenced the jury's verdict. In short, we no violation of appellant's federal constitutional rights.

### B. *Competence of Counsel*

As discussed, once the trial court indicated it would grant the prosecutor's request to play a portion of the audiotape, appellant's counsel insisted the entire recording be played. Appellant contends this cast doubt on trial counsel's competence. We disagree.

"[A] defendant claiming ineffective representation 'must show both that his counsel's performance was deficient when measured against the standard of a reasonably competent attorney and that counsel's deficient performance resulted in prejudice to defendant in the sense that it "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." [Citations.]'" (*People v. Mendoza* (2000) 24 Cal.4th 130, 158, quoting *People v. Kipp* (1998) 18 Cal.4th 349, 366.) "Because after a conviction it is all too easy to criticize defense counsel and claim ineffective assistance, a court must eliminate the distorting effects of hindsight by indulging 'a strong presumption that

13

counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." [Citations.]'" (*People v. Mendoza*, *supra*, at p. 158, quoting *Strickland v. Washington* (1984) 466 U.S. 668, 689.) "'"[If] the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged[,] . . . unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation," the claim on appeal must be rejected.'" (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266, quoting *People v. Wilson* (1992) 3 Cal.4th 926, 936.)

There was ample reason for trial counsel to conclude that playing the audiotape in its entirety would benefit appellant's defense. Much of the conversation between appellant and Campos involved family and personal matters. They discussed his children and their care, and appellant spoke with his youngest child, whose voice is heard on the tape. This tended to humanize appellant (who did not testify), and could have engendered sympathy for him from the jurors. Moreover, appellant's references to the more lenient sentences Pelayo and Camberos received supported counsel's argument that they had made appellant a scapegoat.[7] In view of the likelihood that counsel had tactical reasons for urging the court to play the brief audiotape in its entirety, we cannot find that appellant received ineffective assistance of counsel. (See *People v. Williams* (1988) 44 Cal.3d 883, 936 [to obtain reversal on appeal for ineffective assistance, appellant must show that counsel's acts or omissions "were not attributable to a tactical

---

[7] In closing, defense counsel argued that Pelayo was the shooter, that Pelayo and Camberos had devised a plan to "point the finger at [appellant]" if they were ever arrested, that there was no need to bring appellant into the plot other than "to provide the patsy," and that Pelayo's sentence represented a "deal," giving him "plenty of motive to put [appellant] away."

decision which a reasonably competent, experienced criminal defense attorney would make"].)

### C.  *Parole Revocation Fine*

Appellant contends he should not have been assessed a parole revocation fine because he was sentenced to life without the possibility of parole.  (*People v. Oganesyan* (1999) 70 Cal.App.4th 1178, 1185-1186; see *People v. Brasure* (2008) 42 Cal.4th 1037, 1075.)  Respondent agrees.  Accordingly, the $10,000 fine imposed by the court must be stricken.

## DISPOSITION

The $10,000 parole revocation fine is stricken.  In all other respects the judgment is affirmed.  The clerk of the superior court is directed upon issuance of the remittitur to prepare a corrected abstract of judgment omitting the parole revocation fine, and to forward it to the Department of Corrections and Rehabilitation.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


MANELLA, J.


We concur:



EPSTEIN, P. J.



WILLHITE, J.


16